14 CV 8169

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

OGDEN POWER DEVELOPMENT – CAYMAN,
INC., QUEZON GENERATING COMPANY
LTD and GPI QUEZON, LTD.,

               Petitioners,

    - against -

PMR LIMITED CO. and PMR POWER, INC.,

               Respondents.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JUDGE CASTEL

PETITION TO COMPEL
ARBITRATION AND FOR
ANTI-SUIT INJUNCTION OR
ALTERNATIVELY FOR
PRELIMINARY
INJUNCTION

Index No. _____

Petitioners Ogden Power Development – Cayman, Inc., GPI Quezon, Ltd. and Quezon

Generating Company, Ltd. (together, "Petitioners"), by their attorneys, White & Case LLP, as

and for their Petition to Compel Arbitration and for Anti-Suit Injunction or, in the alternative, for

Preliminary Injunction, allege as follows.

<u>NATURE OF THE PROCEEDING</u>

    1.      This is a proceeding pursuant to the Convention on the Recognition and

Enforcement of Foreign Arbitral Awards, 21 U.S.T. 2517, 330 U.N.T.S. 38 (the "Convention"),

implemented at 9 U.S.C. §§ 201-208 and Federal Rule of Civil Procedure 65(a).  Petitioners

apply for an order compelling arbitration and for an anti-suit injunction, or alternatively, for

preliminary injunctive relief in aid of arbitration proceedings pending in New York (the

"Arbitration"), brought pursuant to the arbitration agreement set forth in section 10.1 of the Third

Amended and Restated Development and Shareholders Agreement, dated October 18, 2004

("Third Amended D&S Agreement") among Petitioners Ogden Power Development – Cayman,

Inc. ("OPDCI"), Quezon Generating Company, Ltd. ("QGC") and GPI Quezon, Ltd. ("GPI")

(each, a Petitioner and together, "Petitioners"), and Respondents PMR Limited Co. ("PMR

Limited") and PMR Power, Inc. ("PMR Power") (each, a Respondent and together,

"Respondents").  Copies of the demand for arbitration and the Third Amended D&S Agreement are attached hereto as Exhibits A and B, respectively.  Petitioners will suffer immediate and irreparable harm if injunctive relief is not granted and otherwise have no adequate remedy at law.

## THE PARTIES

2.  Petitioner, OPDCI is a limited liability company organized and existing under the laws of the Cayman Islands.

3.  Petitioner, QGC is a limited liability company organized and existing under the laws of the Cayman Islands.

4.  Petitioner, GPI is a limited liability company organized and existing under the laws of the Cayman Islands.

5.  Respondent, PMR Limited is a limited partnership organized and existing under the laws of the Philippines.

6.  Respondent, PMR Power is a corporation organized and existing under the laws of Nauru, having its registered office at Alwo, Nauru, Central Pacific.

7.  Daniel Chalmers ("Chalmers") is president of PMR Power and CEO and Chairman of PMR Limited and at all relevant times acted on behalf of and held himself out as the principal for both entities.

## JURISDICTION AND VENUE

8.  This Court has jurisdiction over the subject matter of this proceeding pursuant to 9 U.S.C. § 201 *et seq.*, which provides for federal subject matter jurisdiction over proceedings involving arbitration agreements falling under the New York Convention.  9 U.S.C. § 203 (2006) ("The district courts of the Unites States . . . shall have original jurisdiction over [an action or proceeding falling under the New York Convention]"); see also Borden v. Meiji Milk Prods. Co.,

2

Ltd., 919 F.2d 822, 823 (2d Cir. 1990) (where an arbitration agreement is within the New York Convention, federal courts have subject matter jurisdiction over provisional measures, including requests for injunctive relief, in aid of arbitration).

9.     An arbitration agreement is within the New York Convention if it (i) is in writing, (ii) provides for arbitration in a country that is a signatory of the New York Convention, (iii) is commercial in nature, and (iv) is not purely domestic.  See Smith/Enron Cogeneration Ltd P'ship, Inc. v. Smith Cogeneration Int'l, 198 F.3d 88, 92 (2d Cir. 1999).  The Third Amended D&S Agreement, which is in writing, provides for arbitration in the U.S. (a party to the New York Convention), is commercial in nature, and involves foreign parties and a project located in the Philippines, satisfies all four elements.  (Ex. B § 10.1)

10.     This Court has personal jurisdiction over Respondents by virtue of their agreement to arbitrate all disputes under the Third Amended D&S Agreement in New York (Ex. E § 10.1).  See, e.g., Venconsul N.V. v. TIM Int'l N.V., No. 03 Civ. 5387 (LTS), 2003 WL 21804833, at *3 (S.D.N.Y. Aug. 6, 2003) (court had personal jurisdiction over foreign party: "when a party agrees to arbitrate a dispute in New York, such agreement is deemed consent to the jurisdiction of the courts for the purposes relating to enforcing the arbitration agreement"); Kahn Lucas Lancaster, Inc. v. Lark Intern. Ltd., 956 F. Supp. 1131, 1139 (S.D.N.Y. 1997) ("[W]hen a party agrees to arbitrate a dispute in New York, such agreement is deemed consent to the jurisdiction of the courts for purposes relating to enforcing the arbitration agreement.").

11.     Venue is proper pursuant to 9 U.S.C. § 204 and 28 U.S.C. § 1391(b).

3

ALLEGATIONS OF FACT

A.    The Development and Shareholders Agreement and the Quezon Power Project

12.    Starting in 1994, Petitioners and Respondents or their respective predecessors were involved with aspects of the development, financing, construction, and operation of a 440 megawatt coal-fired power plant in the Quezon Province of the Philippines (the Quezon Power Project"). The terms of the Quezon Power Project were set forth in a Development and Shareholders Agreement ("D&S Agreement") which was amended and restated three times during the period June 30, 1994 to October 18, 2004. The Third Amended D&S Agreement, dated October 18, 2004, is the current agreement among Petitioners OPDCI, QGC and GPI and Respondent PMR Limited with respect to the Quezon Power Project. (Ex. B)

13.    Respondent PMR Limited is a party to the Third Amended D&S Agreement and Respondent PMR Power expressly acknowledged the Third Amended D&S Agreement and has express third party beneficiary rights under the agreement. (Id.)

14.    In connection with the Quezon Power Project and the Third Amended D&S Agreement, Quezon Power, Inc. ("QPI") was established to develop, own and operate the Quezon Project. Subsequently, a limited partnership, Quezon Power (Philippines), Limited Co ("QPPL"), was created of which QPI was and remains the sole general partner. PMR Limited owns a 2% limited partnership interest in QPPL, and a 2% voting interest in QPI. That is all. QPI owns the remaining 98% interest in QPPL and Petitioners QGC, OPDCI and GPI own 100% of the economic interest and the remaining 98% voting interest in QPI. A chart setting forth the ownership structure of the Quezon Power Project is attached hereto as Exhibit C.

15.    The Quezon Power Project was successfully developed and has been operating since May 2000.

4

B.    The San Buenaventura Project

16.    Between 2008 and 2012, New Growth, B.V., a Netherlands company ("New Growth"), which is the international investment entity for listed Thai energy company, Electricity Generating Public Company Limited, and its affiliates, acquired interests in Petitioners OPDCI, QGC and GPI Quezon, Ltd. and all of their respective interests in the Quezon Power Project. Also beginning in 2011, New Growth and Meralco PowerGen Corporation ("MPG"), a wholly owned subsidiary of the local Philippine utility, Manila Electric Company ("Meralco"), began considering the development of a new 460 (net) megawatt power plant (the "San Buenaventura Project") in the vicinity of the Quezon Power Project. The San Buenaventura Project, as contemplated, is a US $1.2 billion project and is viewed as critical to the economy of the Philippines and the well-being of the Filipino people, who suffer high electricity prices and chronic capacity shortages.

17.    Under the current ownership structure, MPG owns a 51% indirect interest in the San Buenaventura Project partnership, San Buenaventura Power Ltd. Co. ("SBPL") and certain affiliates of New Growth own the remaining 49%. None of the Petitioners or Respondents is an owner of the San Buenaventura Project and none of the Petitioners or Respondents is participating in the development of the San Buenaventura Project.

18.    In addition to the general benefit to the public that it offers, the San Buenaventura Project provides a significant opportunity for the Quezon Power Project to reduce or share maintenance and operating costs of certain of its assets, including some assets that are underutilized. The Quezon Power Project also will receive certain new and upgraded facilities that will be paid for by the San Buenaventura Project (the "Upgraded Facilities") (including an administration building, a warehouse, maintenance facilities, motor pool and additional living

5

quarters for persons at and visiting the remote plant site). Both the Quezon Power Project and the San Buenaventura Project will have the ability to use these Upgraded Facilities, but the ownership of the facilities will be vested in QPPL. Many of the existing buildings at the Quezon Power Project to be replaced by the Upgraded Facilities are temporary use facilities installed during plant construction that are prone to damage by the typhoons that frequently lash the plant site. In addition to the value of the Upgraded Facilities themselves, replacing the temporary use facilities with the Upgraded Facilities will result in significant benefit to QPPL through improved safety conditions for the employees of the Quezon Power Project.

19.     For this purpose, QPI (as general partner of QPPL) has caused QPPL to enter into a Site, Facilities, and Services Agreement (the "SFS Agreement") pursuant to which the developers of the San Buenaventura Project are granted access to some of the unused and underutilized property of the Quezon Power Project. The SFS Agreement was signed in November 2013, following approval by the QPI board of directors. When implemented, the SFS Agreement should result in substantial cost savings, benefits of new buildings, and economies of scale for the Quezon Power Project. These benefits likewise will flow to Respondent PMR Limited through its 2% holding.

20.     The San Buenaventura Project is rapidly approaching a critical juncture because the financial closing of the project is scheduled to occur by December 31, 2014, subject to receipt of final authorization by the Energy Regulatory Commission of the Philippines ("ERC"). Final authorization by the ERC is a condition precedent to financial close. In addition, the pricing terms under contracts for engineering, procurement and construction ("EPC") have been locked in to provide favorable project costs for the San Buenaventura Project, provided the notice to proceed under that contract suite is issued before December 31, 2014. If the notice to

6

proceed is not issued by that date, the aggregate price under the EPC contracts becomes subject to escalation.

21.     Respondents' baseless and unreasonable actions and threatened additional legal and regulatory actions in the Philippines, all described below, are threatening ERC approval of the San Buenaventura Project, and thus the financing and future of the project.

C.     Respondents' Unreasonable and Bad Faith Demands Under the Third Amended D&S Agreement With Respect to the San Buenaventura Project

From the outset (over the course of years), Chalmers was included in the discussions relating to the San Buenaventura Project and was invited to participate in (and contribute to) the project.  Chalmers declined to participate.  Chalmers represented on at least one occasion that he had a "conflict" when discussions about potential offtake for an additional plant near the Quezon Power Project on the basis that he was involved with a competing project for another entity for whom Chalmers also served as a principal developer and chief executive officer.  In addition, Chalmers expressed doubts as to whether the San Buenaventura Project could ever go forward in the near term with Meralco as a long term power offtaker anchoring the project economics.

22.     At the same time, Respondent PMR Power asserted that it believed, under a flawed interpretation of § 15.11 of the Third Amended D&S Agreement, that it was entitled to substantial benefits if the San Buenaventura Project went forward.  Additionally, Chalmers threatened to interfere with the development of the San Buenaventura Project through whatever means necessary, including through legal remedies and regulatory actions in the Philippines and elsewhere (and perhaps extrajudicial activity involving officials in the Philippines).

23.     Petitioners disagreed with the interpretation of the Third Amended D&S Agreement advocated by Chalmers and lawyers present with him and made available the time and services of counsel familiar with the history of the agreement to help work with the

7

Respondents and their counsel through the relevant sections thereof. Further, despite their non-participation in the San Buenaventura Project, Petitioners attempted, in good faith, to negotiate a reasonable payment amount that would be more than fair and allow the San Buenaventura Project to proceed on schedule to meet the financial closing and notice to proceed deadline currently scheduled for December 31, 2014.

24.     It quickly became clear to Petitioners that Respondents had no intention of negotiating in good faith and instead were looking to extract a windfall from Petitioners. At one point in the negotiations, Respondents dramatically increased their demand for a payoff. At this time, Respondents also took affirmative steps to interfere with and derail the San Buenaventura Project, as detailed below in Sections E and F.

D.     The Parties' Agreement to Arbitrate

25.     The parties' arbitration clause is set forth in Section 10.1 of the Third Amended D&S Agreement. (Ex. B § 10.1) The provision is broad and covers all disputes arising among the Shareholders regarding the "application or interpretation of any provision of the Agreement or the performance thereof, or the availability of any remedies for breach" of the Agreement. (Id.) The arbitration clause provides,

> In the event a dispute arises among the Shareholders regarding the application or interpretation of any provision of this Agreement or the performance thereof, or the availability of any remedies for breach hereunder, the aggrieved Shareholder shall promptly notify in writing the other shareholders of the dispute, and if the Shareholders shall have failed to resolve the dispute within ten (10) days after delivery of such notice, each Shareholder shall nominate a senior officer of its organization to meet at any mutually agreed upon location to resolve the dispute. Should the Shareholders still be unable to resolve the dispute to their mutual satisfaction within twenty (20) days after such nomination of senior officers, or any mutually agreeable time period, than any shareholder may require that such dispute be submitted to, and determined by, arbitration in accordance with this Section. . . . [S]uch arbitration shall proceed

8

> in accordance with the Commercial Arbitration Rules of the
> American Arbitration Association then in effect . . . All
> proceedings before the arbitrators shall be held in New York, New
> York, U.S.A.

(Ex. B §10.1)

26.     "Shareholders" are defined in the Agreement to include Petitioners OPDCI, QGC

and GPI and Respondent PMR Limited (or their respective successors in interest or permitted

assignees).  Respondent PMR Power is an express third party beneficiary under the agreement

and has rights under § 15.11.  Each of the parties to the Third Amended D&S Agreement,

including Respondents, is a sophisticated commercial entity.

E.      Respondents' Claims With Respect To The San Buenaventura Project

27.     Respondents assert two linked claims in connection with the Petitioners' support

of and QPPL's involvement with respect to the San Buenaventura Project.  First, Respondents

claim entitlement to payment under § 15.11 of the Third Amended D&S Agreement.  Second, in

an effort to force Petitioners' hand with respect to the §15.11 claim, Respondents challenge

QPI's authority, as general partner of QPPL, to allow QPPL to enter into the SFS Agreement and

permit the use of QPPL property and facilities by the San Buenaventura Project.

> 1.     Respondents' Claim of an Entitlement to Payment under Section 15.11 of
>         the Third Amended D&S Agreement

28.     Respondents claim that § 15.11 of the Third D&S Agreement entitles PMR Power

to payment in connection with the use of QPPL property and facilities by the San Buenaventura

Project.  Section 15.11 provides,

> Each of OPDCI, QGC and PMR Power Agrees that it is the
> intention of the parties that participation in the ownership and
> development of any additional coal-fired plant at the site of the
> [Quezon Power] Project shall be on terms and conditions similar to
> those set for the in the D&S Agreement, adjusted to reflect the
> extent of the participation of the respective parties and the

9

> contributions to be made by the parties in connection with such
> ownership and development (it being acknowledged, that PMR
> Power shall be entitled to certain compensation in respect of the
> development and financing of any additional coal fired power plant
> to be located at the site of the [Quezon Power] Project even in the
> event the officers and shareholders of PMR Power do not actively
> participate in the development thereof), which adjusted terms and
> conditions OPDCI, QGC and PMR Power agree that they will
> negotiate mutually agreeable terms and conditions with respect to
> the participation in the ownership and development of such plant.

(Ex. B § 15.11).

29.     Petitioners do not agree with Respondents' interpretation of § 15.11 or that this

provision is even applicable to the San Buenaventura Project.  As an initial matter, none of

OPDCI, QGC or PMR Power are "participating in the ownership and development" of the San

Buenaventura Project.  The San Buenaventura Project is being developed and is owned by SBPL,

with interests in SBPL held by respective affiliates of New Growth and MPG.  Accordingly, §

15.11 does not apply to the Project.  Further, even if § 15.11 does apply to the San Buenaventura

Project, the provision simply requires that the parties negotiate in good faith, which obligation

Petitioners have satisfied.  Finally, under New York law (which governs the Third Amended

D&S Agreement), § 15.11 is a mere agreement to agree and is too indefinite to be enforceable.

> 2.     Respondents' Challenge to QPI's Purpose And Authority As General
>         Partner of QPPL

30.     Linked to Respondents' claim of an entitlement to payment under § 15.11, is

Respondents' challenge to QPI's purpose and authority as general partner of QPPL to allow

QPPL to enter into the SFS Agreement and permit the use of QPPL property and facilities by the

San Buenaventura Project.  Respondent PMR Limited frames this challenge to QPI's authority as

PMR Limited's right under the Limited Partnership Agreement of Quezon Power (Philippines)

Limited between Ogden Quezon Power, Inc.[1] and PMR Limited Co., dated October 30, 1996 (the "Limited Partnership Agreement") to prior written consent to the use of QPPL's property or facilities by the San Buenaventura Project.  A copy of the Limited Partnership Agreement is attached hereto as Exhibit C.  This is the argument that Respondent PMR Limited makes in its Petition for Leave to Intervene ("Intervention Petition") in ERC Case No. 2014-076 RC, dated July 25, 2014, relating to the San Buenaventura Project.  A copy of the Intervention Petition is attached hereto as Exhibit D.

31.     In the Intervention Petition, Respondent PMR Limited contends that under the Limited Partnership Agreement (i) the use by the San Buenaventura Project of QPPL's property and facilities is not among the purposes for which QPPL was formed and (ii) because this use of QPPL's property is inconsistent with the purposes of QPPL, Respondent PMR Limited's prior written consent to the use was required under section 5.1(b).  (Ex. D ¶¶ 4.5-4.7)  Respondent PMR Power further notes the purposes of QPPL as defined in the Recitals to the Limited Partnership agreement which include, in relevant part:

> A. The Development Company [QPI] has been formed for the purpose of (1) developing, implementing, designing, engineering and arranging for financing for that certain approximately 440 megawatt coal-fired power plant to be located in Quezon Province…(the "Project"); (2) obtaining, entering into and performing any and all contracts and engaging in any and all transactions consistent with the foregoing purpose; (3) organizing QPPL (the "Partnership"); and (4) acting as a general and limited partner in the Partnership;

> D. The Partnership [QPPL] is being formed to engage in all aspects of (1) financing, obtaining permits for, constructing, owning, and operating the Project; and (2) obtaining, entering into and performing any and all contracts and engaging in any and all transactions consistent with the foregoing purpose (the "Purpose")

---

[1] Ogden Quezon Power, Inc. is now known as QPI.

11

(Ex. D ¶4.5)

32.     In support of its challenge to QPI's authority as general partner of QPPL,

Respondent PMR Limited also points to § 5.1(b) of the Limited Partnership agreement, which

sets forth the circumstances in which the prior written consent of the limited partners is required.

Under that section, "the acts that require the prior written consent of the Limited Partner (PMR)"

include "doing any act in contravention of the Certificate [of Limited Partnership], including

undertaking or agreeing to undertake, <u>any activity or business for a purpose other than the</u>

<u>Purpose of the Partnership</u> set forth in the Recitals to this Agreement," which PMR expressly

points to in the Intervention Petition as the alleged violation here.  (Ex. C § 5.1 (b)(i) (emphasis

added); Ex. D ¶ 4.6)

33.     Although Respondent PMR Limited does not explain in the Intervention Petition

how the use of QPPL property and facilities by the San Buenaventura Project is not within the

purposes of QPI or QPPL, in the proceedings before the ERC it has taken the position that the

proximity of the San Buenaventura Project to the Quezon Power Plant Facility and the use by the

San Buenaventura Project of the property and facilities of the Quezon Power Plant Facility will

be detrimental to the existing operations of the Quezon Power Plant.  <u>See</u> Manifestation by

Intervenor PMR Limited, dated Sept. 29, 2014 at ¶ 6, a copy of which is attached hereto as

Exhibit E.  In other words, Respondent PMR Limited is directly challenging the authority and

judgment of QPI as general partner of QPPL to allow QPPL to enter into the SFA Agreement

with SBPL and participate in the San Buenaventura Project.

34.     Petitioners do not agree with Respondent PMR Limited's narrow reading of the

Limited Partnership Agreement.[2]  Petitioners further disagree that this dispute can be resolved

---

[2] The Limited Partnership Agreement is silent as to dispute resolution.  (<u>See generally</u>, Ex. C)

without consideration of § 2.2 of the Third Amended D&S Agreement which embodies the

Shareholders' agreement concerning the powers of QPI as general partner of QPPL. (Ex. B §

2.2) The use of QPPL property and facilities by the San Buenaventura Project was authorized by

QPI in its capacity as general partner of QPPL under § 2.2 of the Third Amended D&S

Agreement. As such, Respondent PMR Limited's dispute relative to the San Buenaventura

Project hinges on the purpose of QPI and the authority of QPI under § 2.2 to act as general

partner of QPPL.

     35.    Section 2.2 of the Third Amended D&S Agreement, titled "Purposes of QPI,"

provides,

> The purpose of QPI shall be (a) to act as a general partner and a
> limited partner in the Project Partnership, and (b) in its capacity as
> general partner,…(ii) to obtain, enter into and perform any and all
> contracts and engage in any and all transactions consistent with the
> foregoing purpose…

(Ex. B § 2.2) By the terms of the Limited Partnership Agreement and § 2.2 of the Third

Amended D&S Agreement, QPI was formed for the express purpose of acting as a general and

limited partner in QPPL. (Ex. C, Recital A; Ex. B § 2.2) Moreover, § 2.2 expressly provides

QPI, in its capacity as general partner, the authority to obtain, enter into and perform any and all

contracts and engage in any and all transactions consistent with its purpose to act as general

partner of QPPL. (Ex. B § 2.2) Based on the broad authority given to QPI by the Shareholders

in § 2.2, Petitioners contend that QPI, in supporting the San Buenaventura Project, has at all

times acted within its authority as general partner of QPPL as set forth in the Third Amended

D&S Agreement.

     36.    Because Respondents' challenge to QPI's purpose and its authority as general

partner of QPPL to allow QPPL to enter into a joint venture with the San Buenaventura Project

13

cannot be decided without consideration of the application of § 2.2 of the Third Amended D&S Agreement, this claim is subject to arbitration in New York. Likewise, Respondents' claim that the proximity of the San Buenaventura Project to the Quezon Power Project and the use of QPPL's property and facilities by the San Buenaventura Project will be detrimental to QPPL is clearly a dispute concerning QPI's powers as general partner under § 2.2 and must be resolved through arbitration. (Ex. B §§ 2.2, 10.1) Respondents' claims simply cannot be resolved by the ERC.

F.      Respondents Have Tried to Avoid Their Obligation to Arbitrate

37.      When Respondents realized that Petitioners would not succumb to their demands for an exorbitant payment, PMR Limited initiated a series of spurious regulatory and legal actions (and Chalmers threatened additional actions) to interfere with the development of the San Buenaventura Project. Each of these regulatory and legal actions (and threatened additional actions) relates to the interpretation and application of the Third Amended D&S Agreement.

38.      For example, on July 24, 2014, Respondent PMR Limited, in its capacity as Shareholder of QPI, sent a cease and desist Letter to QPI ("Cease and Desist Letter"), demanding that QPI not allow the use of QPPL property in connection with the San Buenaventura Project. A copy of the Cease and Desist Letter is attached hereto as Exhibit F. In the letter, Respondent PMR Limited demands:

> As a Shareholder in QPI, PMR [Limited] urges QPI, the general partner in QPPL, not to allow the use of QPPL's property for the proposed construction of [the San Buenaventura Project] since this is not consistent with the purpose for which QPPL was formed and because of the potential adverse effects that the construction, commissioning and operation of [the San Buenaventura Project] will have on [the Quezon Power Plant]...PMR [Limited] further demands that QPI and QPPL immediately cease and desist from sharing, operating, employing, and otherwise using the assets of QPPL for the San Buenaventura Project..." and threatening that if

14

QPI and QPPL failed to comply with the demand, "PMR will exhaust all appropriate legal actions...

39.     The potential development of a new power generation facility in the vicinity of the Quezon Power Plant Facility was discussed from time to time at the regular meetings of the Board of Directors of QPI and the SFS Agreement was executed in November 2013 (following approval by the QPI board). But now, eight months later, Respondent PMR Limited demanded that a special meeting of the Board of Directors be called for the purpose of issuing a resolution revoking any approval of the use of the property of QPPL already issued by QPI. (Ex. F)

40.     Respondents could have respected QPI's corporate processes and, if disappointed with the outcome, submitted their dispute with the other Shareholders to arbitration as required under the Third Amended D&S Agreement. (Ex. B §10.1) Instead, on July 25, one day after sending the Cease and Desist Letter, Respondent PMR Limited filed an Intervention Petition in the regulatory proceedings before the ERC in the Philippines in an attempt to derail the Project by claiming entitlements they do not have (and at a minimum are disputed) under the Third Amended D&S Agreement and the related Limited Partnership Agreement. Respondent PMR Limited's Intervention Petition is a red herring. It is nothing more than an attempt to force a payment from Petitioners – by threatening the San Buenaventura Project – under Respondents' flawed interpretation of § 15.11 of the Third Amended D&S Agreement. Rather than seek to resolve this question properly – through arbitration in New York pursuant to the parties' agreement – Respondents attempt to sidestep their obligation with PMR Limited's baseless intervention in the ERC proceeding in the Philippines.

41.     Respondents' efforts to avoid arbitration did not end with demanding extortionate payments from Petitioners and improperly attempting to litigate disputes under the Third Amended D&S Agreement before the ERC. Another Chalmers-controlled entity, PMR Holding

15

Corporation as general partner of PMR Limited also commenced baseless criminal proceedings against various directors of QPI and QPPL in the Philippines concerning Petitioners' refusal to allow Respondents to go on a fishing expedition through QPI's corporate books and records or QPPL's partnership records. This has impeded the ability of the QPI directors to travel freely to and from the Philippines. Additionally, Respondent PMR Limited commenced baseless criminal proceedings against the Facility Manager and Plant Manager of the Quezon Power Project for the same record inspection matters over which these operational managers have no control. PMR Limited's criminal proceedings against these operational managers, who are crucial to the daily management and operation of the Quezon Power Project, threaten the daily operations of the Quezon Power Project. Chalmers represented to Frank Thiel, General Manager of QPPL and CEO of QPI, that he directed the filing of the foregoing criminal proceedings so as "to send a clear message."

42.     Respondents continue to threaten additional spurious proceedings in the Philippines all of which relate to the Third Amended D&S Agreement. As recently as October 1, 2014, a company report was lodged that Respondents' principal, Chalmers, threatened Petitioners, "I have my own set of actions ready to execute on" and "I have a lot of friends [in the Philippines] in different places and can have them make life difficult for people and place them in jail."

G.     QPI's Petition for Declaratory Relief in the Philippines

43.     In response to Respondents' Intervention Petition and Cease and Desist Letter to QPI, QPI filed a Petition for Declaratory Relief in the Philippines in August 2014, as a means of protecting itself against Respondents' claims and threatened additional legal actions. A copy of the Petition for Declaratory Relief is attached hereto as Exhibit G. The Petition seeks a

16

declaration that, for purposes of Philippine law, QPI was acting in the scope of its authority as general partner of QPPL in connection with QPI's decision to allow QPPL to enter into the SFS Agreement and to support the San Buenaventura Project. (Ex. G)

CLAIM FOR RELIEF

44.     Petitioners request that the Court enter an order (1) compelling arbitration of Respondents' dispute with Petitioners under the Third Amended D&S Agreement, and (2) granting an anti-suit injunction, [or alternatively, a preliminary injunction]  (a) directing Respondents to dismiss or cause to be dismissed its petition for intervention in the regulatory proceeding initiated by Meralco in the Philippines in connection with the San Buenaventura Project, in violation of their agreement to arbitrate and (b) restraining the Respondents, and all persons or entities acting on their behalf, from bringing any further legal or regulatory action in the Philippines or any other jurisdiction, in violation of their agreement to arbitrate, with respect to the San Buenaventura Project.

45.     Unless Respondents are enjoined from further pursuing legal or regulatory proceedings in the Philippines, or elsewhere, in violation of their agreement to arbitrate, Petitioners will be immediately and irreparably harmed, through the loss of their contractual right to have their disputes with Respondents resolved through arbitration in New York.  Petitioners have no adequate remedy at law.

*[remainder of page intentionally left blank]*

NEWYORK 9348032

## DEMAND FOR RELIEF

WHEREFORE, Petitioners respectfully request that the Court enter an order (i)

compelling arbitration of Respondents' dispute with Petitioners under the Third Amended D&S

Agreement, and (ii) granting an anti-suit injunction, or alternatively, a preliminary injunction  (a)

directing Respondent PMR Limited to dismiss or cause to be dismissed the Intervention Petition

filed in the regulatory proceeding initiated by Meralco in the Philippines in connection with the

San Buenaventura Project, in violation of their agreement to arbitrate and (b) restraining the

Respondents, and all persons or entities acting on their behalf, from bringing any further legal or

regulatory action in the Philippines or any other jurisdiction, in violation of their agreement to

arbitrate, with respect to the San Buenaventura Project.

Dated:  New York, New York
       October 10, 2014

WHITE & CASE LLP

By: _____

Gregory G. Little (GL5850)
David G. Hille (DH9865)
Danielle M. Audette (DA1218)
1155 Avenue of the Americas
New York, New York 10036
Tel:  (212) 819-8200

*Attorneys for Petitioners*