## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK



OGDEN POWER DEVELOPMENT – CAYMAN, INC., QUEZON GENERATING COMPANY LTD, and GPI QUEZON, LTD.

            Petitioners,

      - against -

PMR LIMITED CO. and PMR POWER, INC.

          Respondents.

14 CV 8169

JUDGE CASTEL

Case No.:

U.S. DISTRICT COURT
FILED
OCT 10 2014
S.D. OF N.Y.

---

## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION TO COMPEL ARBITRATION AND FOR ANTI-SUIT INJUNCTION
## OR ALTERNATIVELY FOR PRELIMINARY INJUNCTIVE RELIEF

WHITE & CASE LLP

1155 Avenue of the Americas
New York, New York 10036
(212) 819-8200

*Attorneys for Petitioners*

# TABLE OF CONTENTS

Page

THE PARTIES.............................................................................................. 1

STATEMENT OF FACTS ........................................................................... 2

    I.     Background ......................................................................... 2

    II.    Respondents' Unreasonable And Bad Faith Demands Under The Third Amended D&S Agreement With Respect To The San Buenaventura Project. ....................................................... 5

    III.   The Parties' Agreement To Arbitrate .................................... 6

    IV.   Respondents' Claims With Respect To The San Buenaventura Project ............................................................................. 7

    V.    Respondents Have Tried To Avoid Their Obligation to Arbitrate .......... 12

ARGUMENT ............................................................................................... 15

    I.     The Court Should Compel Respondents To Arbitrate Their Contractual Disputes .......................................................... 15

    II.    The Court Should Enjoin Respondents From Their Current And Future Efforts To Avoid Their Obligation To Arbitrate .......................... 20

CONCLUSION ............................................................................................ 39

# TABLE OF AUTHORITIES

## CASES

A.P Moeller-Maersk A/S v. Comercializadora de Calidad S.A.
429 F. App'x 25 (2d Cir. 2011) ................................................................30

Am. Bureau of Shipping v. Tencara Shipyard S.P.A., 170 F.3d 349 (2d Cir. 1999)..................17, 18

Amaprop Ltd. v. Indiabulls Finan. Servs. Ltd., No. 10 Civ. 1853(PGG), 2010 WL 1050988
(S.D.N.Y. Mar. 23, 2010) ...........................................................20, 29, 30, 32

Arciniaga v. General Motors Corp., 460 F.3d 231 (2d Cir. 2006)................................28, 38

Atla-Medine v. Crompton Corp., No. 00 Civ. 5901(HB), 2001 WL 1382592 (S.D.N.Y. 2001) .....33

China Trade & Dev. Corp v. M.V. Choong Yong, 837 F.2d 33 (2d Cir. 1987)........................20, 21

Collins & Aikman Prod. Co. v. Building Systems, Inc., 58 F.3d 16 (2d Cir. 1995) ........................16

Curtis, Mallet-Prevost, Colt & Mosle v. Garza-Morales, 308 A.D.2d 261, 762 N.Y.S.2d 607
(N.Y. App. Div. 2003) ...................................................................27

Dean Witter Reynolds Inc. v. Byrd, 470 U.S. 213 (1985)................................................16

Freedman v. Pearlman, 271 A.D.2d 301 (N.Y. App. Div. 2000) ......................................35

Gen. Protecht Grp., Inc. v. Levion Mfg. Co., Inc., 651 F.3d 1355 (Fed. Cir. 2011) ......................37

Glanzer v. Keilin & Bloom LLC, 281 A.D.2d 371 (N.Y. App. Div. 2001) ....................................34

Ibeto Petrochemical Indus. Ltd. v. M/T Beffen, 475 F.3d 56.........................................25, 30

In re Petitions of Laitasalo, 196 B.R. 913 (S.D.N.Y. 1996) ..............................................17

Int'l Equity Invs., Inc. v. Opportunity Equity Partners Ltd.
441 F. Supp. 2d 552 (S.D.N.Y. 2006)..................................................21, 23

Joseph Martin Jr., Delicatessen v. Schumacher, 417 N.E.2d 541, 52 N.Y.2d 105 (N.Y. 1981) ......34

Life Technologies Corp. v. AB Sciex Pte. Ltd., 803 F. Supp. 2d 270 (S.D.N.Y. 2011) .................18

Mitsubishi Motors Corp v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614 (1985)............................28

Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1 (1983) ....................................15

Motorola Credit Corp. v. Uzan
    No. 02 Civ. 666(JSR), 2003 WL 56998 (S.D.N.Y. Jan. 7, 2003)..........................................21, 23

Natsource LLC v. Paribello, 151 F. Supp. 2d 465 (S.D.N.Y. 2001) ..................................................37

Paramedics Electromedicina Comercial, Ltd. v. GE Med. Sys. Info. Techs., Inc., 369 F.3d 645
    (2d Cir. 2004) ................................................................................................................... passim

Rossoff v. Mountain Laurel Center for Performing Arts
    317 F. Supp. 2d 493 (S.D.N.Y. 2004).......................................................................................34

Rothschild v. Naamlooze Vennootschap Gebroeders Pappenheim's Tabakshandel, 87 N.Y.S.2d
    189 (N.Y. Sup. Ct. 1949) .........................................................................................................27

S.A. Mineracao Da Trindade-Samitri v. Utah Int'l, Inc., 745 F.2d 190 (2d Cir. 1984) ...................16

S.M. Wolff Co. v. Tulkoff, 174 N.E.2d 478, 9 N.Y.2d 356 (N.Y. 1961)..........................................27

Scherk v. Alberto-Culver Co., 417 U.S. 506 (1974)..........................................................................16

Shaw Group Inc. v. Triplefine Int'l Corp., 322 F.3d 115 (2d Cir. 2003) ....................................16, 17

Software AG, Inc. v. Consist Software Solutions, Inc., No. 08 Civ. 389(CM)(FM), 2008 WL
    563449 (S.D.N.Y. Feb. 21, 2008)......................................................................................27, 29

Storm LLC v. Telenor Mobile Comms. AS, No. 06 Civ. 13157(GEL), 2006 WL 3735657
    (S.D.N.Y. Dec. 15, 2006)...............................................................21, 23, 24, 25, 28, 29, 32

T-JAT Sys. 2006 Ltd. v. AMDOCS Software Sys. Ltd., No. 13 Civ. 5356(HB), 2013 WL
    6409476 (S.D.N.Y. Dec. 9 2013)..............................................................................................30

Telenor Mobile Comms. AS v. Storm LLC, 584 F.3d 396 (2d Cir. 2009).................................28, 38

Tradescape.com v. Shivaram, 77 F. Supp. 2d 408 (S.D.N.Y. 1999) .................................................37

Travelport Global Distrib. Sys. v. Bellview Airlines Ltd., No. 12 Civ. 3483(DLC), 2012 WL
    3925856 (S.D.N.Y. Sept. 10, 2012)..........................................................................................29

Ward v. Pricecellular Corp., No. 90 Civ. 5214(MGC)1991 ............................................................34

Wu v. Pearson Educ., Inc.
    No. 09-Civ-6557(RJH), 2010 WL 3791676 (S.D.N.Y Sept. 29, 2010) .....................................18

## STATUTES AND RULES

Federal Arbitration Act ......................................................................................................................15

Petitioners and Respondents are parties to a contract that contains a binding arbitration provision. Rather than honor their obligation to arbitrate, Respondents are seeking to have issues arising under the contract determined in regulatory and other proceedings in the Philippines. Petitioners bring this proceeding to (i) compel Respondents to arbitrate their contractual dispute in New York, as agreed and (ii) have Respondents enjoined from depriving Petitioners of their bargained for right to arbitrate all disputes under the contract.

Petitioners have commenced, concurrently herewith, an arbitration with the American Arbitration Association in New York (the "Arbitration"). A copy of the demand for arbitration is attached to the Petition as Exhibit A. The Arbitration is pursuant to § 10.1 of the Third Amended and Restated Development and Shareholders Agreement, dated October 18, 2004 ("Third Amended D&S Agreement") among Petitioners Ogden Power Development – Cayman, Inc. ("OPDCI"), Quezon Generating Company, Ltd. ("QGC") and GPI Quezon, Ltd. ("GPI") (each, a Petitioner and together, "Petitioners"), and Respondents PMR Limited Co. ("PMR Limited") and PMR Power, Inc. ("PMR Power") (each, a Respondent and together, "Respondents"). A Copy of the Third Amended D&S Agreement is attached to the Petition as Exhibit B.

<u>THE PARTIES</u>

Petitioners, OPDCI, QGC and GPI are limited liability companies organized and existing under the laws of the Cayman Islands. (Declaration of John Matthew Palumbo ("Palumbo Decl."), submitted in connection herewith at ¶ 2)

Respondent, PMR Limited is a limited partnership organized and existing under the laws of the Philippines. (<u>Id.</u> ¶ 3) Respondent, PMR Power is a corporation organized and existing under the laws of Nauru, having its registered office at Alwo, Nauru, Central Pacific. (<u>Id.</u> ¶ 4) Daniel Chalmers ("Chalmers") is president of PMR Power and CEO and Chairman of PMR

1

Limited and at all relevant times acted on behalf of and held himself out as the principal for both entities. (Id. ¶ 5)

STATEMENT OF FACTS

I.    Background

    A.    The Quezon Power Project

Starting in 1994, Petitioners and Respondents or their respective predecessors were involved with aspects of the development, financing, construction, and operation of a 440 megawatt coal-fired power plant in the Quezon Province of the Philippines (the "Quezon Power Project"). (Id. ¶ 6) The terms of the Quezon Power Project were set forth in a Development and Shareholders Agreement ("D&S Agreement") which was amended and restated three times during the period June 30, 1994 to October 18, 2004. (Id.) The Third Amended D&S Agreement, dated October 18, 2004, is the parties' current agreement with respect to the Quezon Power Project. (Declaration of Gregory G. Little ("Little Decl.") submitted in connection herewith, Ex. B) Respondent PMR Limited is a party to the Third Amended D&S Agreement and Respondent PMR Power expressly acknowledged the Third Amended D&S Agreement and has express third party beneficiary rights under the agreement. (Id.)

In connection with the Quezon Power Project and the Third Amended D&S Agreement, Quezon Power, Inc. ("QPI") was established to develop, own and operate the Quezon Project. (Little Decl., Ex. B) Subsequently, a limited partnership, Quezon Power (Philippines), Limited Co ("QPPL"), was created of which QPI was and remains the sole general partner. PMR Limited owns a 2% limited partnership interest in QPPL, and a 2% voting interest in QPI. (Little Decl., Ex. C) PMR Limited owns a minority 2% limited partnership interest in QPPL, and a 2% voting interest in QPI. (Little Decl., Ex. B) That is all. QPI owns the remaining 98% interest in

2

QPPL and Petitioners QGC, OPDCI and GPI own 100% of the economic interest and the remaining 98% voting interest in QPI.[1] (Id.)  The Quezon Power Project was successfully developed and has been operating since May 2000.

      B.      The San Buenaventura Project

      Between 2008 and 2012, New Growth, B.V., a Netherlands company ("New Growth"), which is the international investment entity for listed Thai energy company, Electricity Generating Public Company Limited, and its affiliates, acquired interests in Petitioners OPDCI, QGC and GPI Quezon, Ltd. and all of their respective interests in the Quezon Power Project. (Palumbo Decl. ¶ 8)  Also beginning in 2011, New Growth and Meralco PowerGen Corporation ("MPG"), a wholly owned subsidiary of the local Philippine utility, Manila Electric Company ("Meralco"), began considering the development of a new 460 (net) megawatt power plant (the "San Buenaventura Project") in the vicinity of the Quezon Power Project. (Id. ¶ 9)  The San Buenaventura Project, as contemplated, is a US $1.2 billion project and is viewed as critical to the economy of the Philippines and the well-being of the Filipino people, who suffer high electricity prices and chronic capacity shortages. (Id.)

      Under the current ownership structure, MPG owns a 51% indirect interest in the San Buenaventura Project partnership, San Buenaventura Power Ltd. Co. ("SBPL") and certain affiliates of New Growth own the remaining 49%. (Id. ¶ 10)  None of the Petitioners or Respondents is an owner of the San Buenaventura Project and none of the Petitioners or Respondents is participating in the development of the San Buenaventura Project. (Id.)

      In addition to the general benefit to the public that it offers, the San Buenaventura Project also provides a significant opportunity for the Quezon Power Project to reduce or share

---

[1] A chart setting forth the ownership structure of the Quezon Power Project is attached hereto as Exhibit H to the Little Declaration.

3

maintenance and operating costs of certain of its assets, including some assets that are underutilized.   (Id. ¶ 11)  The Quezon Power Project also will receive certain new and upgraded facilities that will be paid for by the San Buenaventura Project (the "Upgraded Facilities") (including an administration building, a warehouse, maintenance facilities, motor pool and additional living quarters for persons at and visiting the remote plant site).  (Id. ¶ 12)  Both the Quezon Power Project and the San Buenaventura Project will have the ability to use these Upgraded Facilities, but the ownership of the facilities will be vested in QPPL.  (Id.)  Many of the existing buildings at the Quezon Power Project to be replaced by the Upgraded Facilities are temporary use facilities installed during plant construction that are prone to damage by the typhoons that frequently lash the plant site.  (Id.)  In addition to the value of the Upgraded Facilities themselves, replacing the temporary use facilities with the Upgraded Facilities will result in significant benefit to QPPL through improved safety conditions for the employees of the Quezon Power Project.  (Id.)

For this purpose, QPI (as general partner of QPPL) has caused QPPL to enter into a Site, Facilities, and Services Agreement (the "SFS Agreement") pursuant to which the developers of the San Buenaventura Project are granted access to some of the unused and underutilized property of the Quezon Power Project.  (Id. ¶ 13)  The SFS Agreement was signed in November 2013, following approval by the QPI board of directors.  (Id. ¶ 14)  When implemented, the SFS Agreement is expected to result in substantial cost savings, benefits of new buildings, and economies of scale for the Quezon Power Project.  (Id.)  This benefit likewise will flow to Respondents through their 2% holding.  (Little Decl., Ex. B)

The San Buenaventura Project is rapidly approaching a critical juncture because the financial closing of the project is scheduled to occur by December 31, 2014, subject to receipt of

4

final authorization by the Energy Regulatory Commission of the Philippines ("ERC"). (Palumbo Decl. ¶ 15) Final authorization by the ERC is a condition precedent to financial close. (Id.) In addition, the pricing terms under contracts for engineering, procurement and construction ("EPC") have been locked in to provide favorable project costs for the San Buenaventura Project, provided the notice to proceed under that contract suite is issued before December 31, 2014. (Id. ¶ 16) If the notice to proceed is not issued by that date, the aggregate price under the EPC contracts becomes subject to escalation. (Id.) Respondents' baseless and unreasonable actions and threatened additional legal and regulatory actions in the Philippines, all described below, are threatening ERC approval of the San Buenaventura Project, and thus the financing and future of the project.

II.   Respondents' Unreasonable And Bad Faith Demands Under The Third Amended D&S Agreement With Respect To The San Buenaventura Project

From the outset (over the course of years), Chalmers, was included in the discussions relating to the San Buenaventura Project and was invited to participate in (and contribute to) the project. (Id. ¶ 17) Chalmers declined to participate. (Id. ¶ 18) Chalmers represented on at least one occasion that he had a "conflict" when discussions about potential offtake for an additional plant near the Quezon Power Project on the basis that he was involved with a competing project for another entity for whom Chalmers also served as a principal developer and chief executive officer. (Id. ¶ 19) In addition, Chalmers expressed doubts as whether the San Buenaventura Project could ever go forward in the near term with Meralco as a long term power offtaker anchoring the project economics. (Id.)

At the same time, Respondent PMR Power asserted that it believed, under a flawed interpretation of § 15.11 of the Third Amended D&S Agreement, that it was entitled to substantial benefits if the San Buenaventura Project went forward. (Id.) Additionally, Chalmers

5

has threatened to interfere with the development of the San Buenaventura Project through

whatever means necessary, including through legal remedies and regulatory actions in the

Philippines and elsewhere (and perhaps extrajudicial activity involving officials in the

Philippines).  (Id. ¶ 20)

      Petitioners disagreed with Respondents' interpretation of the Third Amended D&S

Agreement and made available the time and services of counsel familiar with the history of the

agreement to help work with the Respondents and their counsel through the relevant sections

thereof.  (Id. ¶ 21)  Further, despite their non-participation in the San Buenaventura Project,

Petitioners attempted, in good faith, to negotiate a reasonable payment amount that would be

more than fair and allow the San Buenaventura Project to proceed on schedule to meet the

financial closing and notice to proceed deadline currently scheduled for December 31, 2014.  (Id.

¶ 22)

      It quickly became clear to Petitioners that Respondents had no intention of negotiating in

good faith and instead were looking to extract a windfall from Petitioners.  (Id. ¶ 23)  At one

point in the negotiations, Respondents dramatically increased their demand for a payoff.  (Id.)

At this time, Respondents also took affirmative steps to interfere with and derail the San

Buenaventura Project, as detailed below in Sections IV and V.

III.    The Parties' Agreement To Arbitrate

      The parties' arbitration clause is set forth in Section 10.1 of the Third Amended D&S

Agreement.  (Little Decl., Ex. B § 10.1)  The provision is broad and covers all disputes arising

among the Shareholders regarding the "application or interpretation of any provision of the

Agreement or the performance thereof, or the availability of any remedies for breach" of the

Agreement.[2] (Id. (emphasis added)) "Shareholders" are defined in the Agreement to include Petitioners OPDCI, QGC and GPI and Respondent PMR Limited (or their respective successors in interest or permitted assignees). (Id. § 2.1) Respondent PMR Power is an express third party beneficiary under the agreement and has rights under § 15.11. Each of the parties to the Third Amended D&S Agreement, including Respondents, is a sophisticated commercial entity. (Palumbo Decl. ¶ 7)

IV.   Respondents' Claims With Respect To The San Buenaventura Project

Respondents assert two linked claims in connection with the Petitioners' support of the San Buenaventura Project. First, Respondents claim entitlement to payment under §15.11 of the Third Amended D&S Agreement. Second, in an effort to force Petitioners' hand with respect to the §15.11 claim, Respondents challenge QPI's authority, as general partner of QPPL, to allow QPPL to enter into the SFS Agreement and permit the use of QPPL property and facilities by the San Buenaventura Project.

---

[2] Section 10.1 of the Third Amended D&S Agreement, titled "Dispute Resolution" provides,

> In the event a dispute arises among the Shareholders regarding the application or interpretation of any provision of this Agreement or the performance thereof, or the availability of any remedies for breach hereunder, the aggrieved Shareholder shall promptly notify in writing the other shareholders of the dispute, and if the Shareholders shall have failed to resolve the dispute within ten (10) days after delivery of such notice, each Shareholder shall nominate a senior officer of its organization to meet at any mutually agreed upon location to resolve the dispute. Should the Shareholders still be unable to resolve the dispute to their mutual satisfaction within twenty (20) days after such nomination of senior officers, or any mutually agreeable time period, than any shareholder may require that such dispute be submitted to, and determined by, arbitration in accordance with this Section. . . . [S]uch arbitration shall proceed in accordance with the Commercial Arbitration Rules of the American Arbitration Association then in effect . . . All proceedings before the arbitrators shall be held in New York, New York, U.S.A.

A.    <u>Respondents' Claim Of An Entitlement To Payment Under Section 15.11</u>

Respondents contend that § 15.11 of the Third Amended D&S Agreement entitles PMR

Power to payment in connection with the use of QPPL property and facilities by the San

Buenaventura Project.  Section 15.11 provides,

> Each of OPDCI, QGC and PMR Power Agrees that it is the
> intention of the parties that participation in the ownership and
> development of any additional coal-fired plant at the site of the
> [Quezon Power] Project shall be on terms and conditions similar to
> those set for the in the D&S Agreement, adjusted to reflect the
> extent of the participation of the respective parties and the
> contributions to be made by the parties in connection with such
> ownership and development (it being acknowledged, that PMR
> Power shall be entitled to certain compensation in respect of the
> development and financing of any additional coal fired power plant
> to be located at the site of the [Quezon Power] Project even in the
> event the officers and shareholders of PMR Power do not actively
> participate in the development thereof), which adjusted terms and
> conditions OPDCI, QGC and PMR Power agree that they will
> negotiate mutually agreeable terms and conditions with respect to
> the participation in the ownership and development of such plant.

(Little Decl., Ex. B §15.11).

Petitioners do not agree with Respondents' interpretation of § 15.11 or that this provision

is even applicable to the San Buenaventura Project.  As an initial matter, none of OPDCI, QGC

or PMR Power are "participating in the ownership and development" of the San Buenaventura

Project.  (Palumbo Decl. ¶ 10)  The San Buenaventura Project is being developed and is owned

by SBPL, with interests in SBPL held by respective affiliates of New Growth and MPG.  (Id.)

Thus, on its face, § 15.11 does not apply to the Project.  Even if § 15.11 does apply to the San

Buenaventura Project, the provision simply requires that the parties negotiate in good faith,

which obligation Petitioners have satisfied.  Finally, under New York law (which governs the

Third Amended D&S Agreement), § 15.11 is a mere agreement to agree and is too indefinite to

be enforceable.

8

B.    Respondents' Challenge to QPI's Purpose And Authority As General Partner of
      QPPL

Linked to Respondents' claim of an entitlement to payment under § 15.11, is

Respondents' challenge to QPI's purpose and authority as general partner of QPPL to allow

QPPL to enter into the SFS Agreement and permit the use of QPPL property and facilities by the

San Buenaventura Project.  Respondent PMR Limited frames this challenge to QPI's authority as

PMR Limited's right under the Limited Partnership Agreement of Quezon Power (Philippines)

Limited between Ogden Quezon Power, Inc.[3] and PMR Limited Co., dated October 30, 1996

(the "Limited Partnership Agreement") to prior written consent to the use of QPPL's property or

facilities by the San Buenaventura Project.  This is the argument that Respondent PMR Limited

makes in its Petition for Leave to Intervene ("Intervention Petition") in ERC Case No. 2014-076

RC, dated July 25, 2014, relating to the San Buenaventura Project.  (Little Decl., Ex. D)

In the Intervention Petition, Respondent PMR Limited contends that under the Limited

Partnership Agreement (i) the use by the San Buenaventura Project of QPPL's property and

facilities is not among the purposes for which QPPL was formed and (ii) because this use of

QPPL's property is inconsistent with the purposes of QPPL, Respondent PMR Limited's prior

written consent to the use was required under section 5.1(b).  (Id. ¶¶ 4.5-4.7)  Respondent PMR

Power further notes the purposes of QPPL as defined in the Recitals to the Limited Partnership

agreement which include, in relevant part:

> A. The Development Company [QPI] has been formed for the
> purpose of (1) developing, implementing, designing, engineering
> and arranging for financing for that certain approximately 440
> megawatt coal-fired power plant to be located in Quezon
> Province…(the "Project"); (2) obtaining, entering into and
> performing any and all contracts and engaging in any and all
> transactions consistent with the foregoing purpose; (3) organizing

---

[3] Ogden Quezon Power, Inc. is now known as QPI.

9

> QPPL (the "Partnership"); and (4) acting as a general and limited
> partner in the Partnership;
>
> D. The Partnership [QPPL] is being formed to engage in all
> aspects of (1) financing, obtaining permits for, constructing,
> owning, and operating the Project; and (2) obtaining, entering into
> and performing any and all contracts and engaging in any and all
> transactions consistent with the foregoing purpose (the "Purpose")

(Little Decl., Ex. D ¶ 4.5; see also Ex. C, Recitals A, D)

In support of its challenge to QPI's authority to act as general partner of QPPL,

Respondent PMR Limited also points to Section 5.1(b) of the Limited Partnership agreement,

which sets forth the circumstances in which the prior written consent of the limited partner, PMR

Limited, is required.  Under that section, "the acts that require the prior written consent of the

Limited Partner (PMR)" include "doing any act in contravention of the Certificate [of Limited

Partnership], including undertaking or agreeing to undertake, any activity or business for a

purpose other than the Purpose of the Partnership set forth in the Recitals to this Agreement,"

which PMR expressly points to in the Intervention Petition as the alleged violation here.  (Id.,

Ex. C § 5.1 (b)(i) (emphasis added), Ex. D ¶ 4.6)

Although Respondent PMR Limited does not explain in the Intervention Petition how the

use of QPPL property and facilities by the San Buenaventura Project is not within the purposes

of QPI or QPPL, in the proceedings before the ERC, it has taken the position that the proximity

of the San Buenaventura Project to the Quezon Power Plant Facility and the use by the San

Buenaventura Project of the property and facilities of the Quezon Power Plant Facility will be

detrimental to the existing operations of the Quezon Power Plant.  (Id., Ex. E)  In other words,

Respondent PMR Limited is directly challenging the authority and judgment of QPI as general

partner of QPPL to allow QPPL to enter into the SFS Agreement with SBPL and participate in

the San Buenaventura Project.

Petitioners do not agree with Respondent PMR Limited's narrow reading of the Limited Partnership Agreement.[4]  Petitioners further disagree that this dispute can be resolved without consideration of § 2.2 of the Third Amended D&S Agreement which embodies the Shareholders' agreement concerning the purposes and powers of QPI as general partner of QPPL.  (Id., Ex. B § 2.2)  The use of QPPL property and facilities by the San Buenaventura Project was authorized by QPI in its capacity as general partner of QPPL under § 2.2 of the Third Amended D&S Agreement.  As such, Respondent PMR Limited's dispute relative to the San Buenaventura Project hinges on the purpose of QPI and the authority of QPI under § 2.2 to act as general partner of QPPL.

Section 2.2 Third Amended D&S Agreement, titled "Purposes of QPI," provides,

> The purpose of QPI shall be (a) to act as a general partner and a
> limited partner in the Project Partnership, and (b) in its capacity as
> general partner,…(ii) to obtain, enter into and perform any and all
> contracts and engage in any and all transactions consistent with the
> foregoing purpose…

(Id., Ex. B § 2.2)  By the terms of the Limited Partnership Agreement and § 2.2 of the Third Amended D&S Agreement, QPI was formed for the express purpose of acting as a general and limited partner in QPPL.  (Id., Ex. C, Recital A; Ex. B § 2.2)  Moreover, § 2.2 expressly provides QPI, in its capacity as general partner, the authority to obtain, enter into and perform any and all contracts and engage in any and all transactions consistent with its purpose to act as general partner of QPPL.  (Id., Ex. B § 2.2)  In light of the broad authority given to QPI by the Shareholders in § 2.2, Petitioners contend that QPI, in exercising its authority as general partner of QPPL to permit QPPL to enter into the SFS Agreement and thereby allow the use of QPPL property and facilities by the San Buenaventura Project, QPI has at all times acted within its

---

[4] The Limited Partnership Agreement is silent as to dispute resolution.  (See generally, Little Decl., Ex. C)

authority under § 2.2.  Additionally, QPI's determination that the proximity of the San

Buenaventura Project to the Quezon Power Plant Facility and the use of QPPL's property and

facilities by the San Buenaventura Project would not be detrimental to QPPL is squarely within

QPI's powers as general partner.  In any event, these questions must be resolved through

arbitration.  (Id., Ex. B § 10.1)  These questions simply cannot be resolved by the ERC.

V.      Respondents Have Tried To Avoid Their Obligation to Arbitrate

        When Respondents realized that Petitioners would not succumb to their demands for an

exorbitant payment, PMR Limited initiated a series of spurious regulatory and legal actions (and

Chalmers threatened additional actions) to interfere with the development of the San

Buenaventura Project.  (Palumbo Decl. ¶ 26)  Each of these regulatory and legal actions (and

threatened additional actions) relates to the interpretation and application of the Third Amended

D&S Agreement.

        For example, on July 24, 2014, Respondent PMR Limited, in its capacity as Shareholder

of QPI, sent a cease and desist Letter to QPI ("Cease and Desist Letter"), demanding that QPI

not allow the use of QPPL property in connection with the San Buenaventura Project.  (Little

Decl., Ex. F)  In the letter, Respondent PMR Limited demands:

> As a Shareholder in QPI, PMR [Limited] urges QPI, the general
> partner in QPPL, not to allow the use of QPPL's property for the
> proposed construction of [the San Buenaventura Project] since this
> is not consistent with the purpose for which QPPL was formed and
> because of the potential adverse effects that the construction,
> commissioning and operation of [the San Buenaventura Project]
> will have on [the Quezon Power Plant]...PMR [Limited] further
> demands that QPI and QPPL immediately cease and desist from
> sharing, operating, employing, and otherwise using the assets of
> QPPL for the San Buenaventura Project..." and threatening that if
> QPI and QPPL failed to comply with the demand, "PMR will
> exhaust all appropriate legal actions...

12

(Id., Ex. F)  The potential development of a new power generation facility in the vicinity of the Quezon Power Plant Facility was discussed from time to time at the regular meetings of the Board of Directors of QPI and the SFS Agreement was executed in November 2013 (following approval by the QPI board).  (Palumbo Decl. ¶ 14)  But now, eight months later, Respondent PMR Limited demanded that a special meeting of the Board of Directors be called for the purpose of issuing a resolution revoking any approval of the use of the property of QPPL already issued by QPI. (Little Decl., Ex. F)

Respondents could have respected QPI's corporate processes and, if disappointed with the outcome, submitted their dispute with the other Shareholders to arbitration as required under the Third Amended D&S Agreement.  (Id., Ex. B § 10.1)  Instead, on July 25, one day after sending the Cease and Desist Letter, Respondent PMR Limited filed an Intervention Petition in the regulatory proceedings before the ERC in the Philippines in an attempt to derail the Project by claiming entitlements they do not have (and at a minimum are disputed) under the Third Amended D&S Agreement and the related Limited Partnership Agreement.  (Id., Ex. E) Respondents' Intervention Petition is a red herring.  It is nothing more than an attempt to force a payment from Petitioners – by threatening the San Buenaventura Project – under Respondents' flawed interpretation of § 15.11.  Rather than seek to resolve this question properly – through arbitration in New York – Respondents attempt to sidestep their obligation with a baseless intervention in the ERC proceeding in the Philippines.

Respondents' efforts to avoid arbitration did not end with demanding extortionate payments from Petitioners and improperly attempting to litigate disputes under the Third Amended D&S Agreement before the ERC.  Another Chalmers-controlled entity, PMR Holding Corporation as general partner of PMR Limited also commenced baseless criminal proceedings

13

against various directors of QPI and QPPL in the Philippines concerning Petitioners' refusal to allow Respondents to go on a fishing expedition through QPI's corporate books and records or QPPL's partnership records. (Palumbo Decl. ¶ 25)  This has impeded the ability of the QPI directors to travel freely to and from the Philippines. (Id.)  Additionally, Respondent PMR Limited commenced baseless criminal proceedings against the Facility Manager and Plant Manager of the Quezon Power Project for the same record inspection matters over which these operational managers have no control. (Id.)  PMR Limited's criminal proceedings against these operational managers, who are crucial to the daily management and operation of the Quezon Power Project, threaten the daily operations of the Quezon Power Project. (Id.)  Chalmers represented to Frank Thiel, General Manager of QPPL and CEO of QPI, that he directed the filing of the foregoing criminal proceedings so as "to send a clear message." (Id. ¶ 26)

Respondents continue to threaten additional spurious proceedings in the Philippines, all of which relate to the Third Amended D&S Agreement. (Id. ¶ 27)  As recently as October 1, 2014, a company report was lodged that Respondents' principal, Chalmers, threatened Petitioners, "I have my own set of actions ready to execute on" and "I have a lot of friends [in the Philippines] in different places and can have them make life difficult for people and place them in jail." (Id.)

VI.    QPI's Petition For Declaratory Relief In The Philippines

In response to Respondents' Intervention Petition and Cease and Desist Letter to QPI, QPI filed a Petition for Declaratory Relief in the Philippines in August 2014, as a means of protecting itself against Respondents' claims and threatened additional legal actions. (Little

14

Decl., Ex. G)  The Petition seeks a declaration that, for purposes of Philippine law, QPI was

acting in the scope of its authority as general partner of QPPL in connection with QPI's decision

to allow QPPL to enter into the SFS Agreement and to support the San Buenaventura Project.

(Id.)

ARGUMENT

Respondents' efforts to avoid their obligations to arbitrate in New York should not be

tolerated.  Petitioners ask this Court to hold Respondents to their contractual obligation to

arbitrate all disputes arising under the Third Amended D&S Agreement and enter an order: (i)

compelling Respondents to arbitrate their disputes in New York and (ii) granting an anti-suit

injunction, or alternatively, preliminary injunctive relief (a) directing Respondent PMR Limited

to dismiss or cause to be dismissed its petition for intervention in the regulatory proceeding

initiated by Meralco in the Philippines in connection with the San Buenaventura Project and (b)

restraining the Respondents, and all persons or entities acting on their behalf, from bringing any

further legal or regulatory action in the Philippines or any other jurisdiction with respect to the

San Buenaventura Project.  Injunctive relief is necessary to preserve the parties' agreement to

arbitrate, which the Respondents would undermine if they are allowed to persist in their strategy

to initiate multiple and spurious actions in the Philippines or elsewhere.

I.      The Court Should Compel Respondents To Arbitrate Their Contractual Disputes

        A.      The FAA Requires An Order Compelling Respondents To Arbitrate

        The Federal Arbitration Act ("FAA" or "New York Convention") embodies a strong

legislative intent to enforce valid arbitration clauses.  See Moses H. Cone Mem'l Hosp. v.

15

Mercury Constr. Corp., 460 U.S. 1, 24 (1983) (the FAA is "a congressional declaration of a liberal federal policy favoring arbitration agreements"); Scherk v. Alberto-Culver Co., 417 U.S. 506, 520 n.15 (1974) (the purpose of the New York Convention and its acceptance by the United States "was to encourage the recognition and enforcement of commercial arbitration agreements in international contracts"). The Second Circuit recognizes this strong public policy and has interpreted it to require arbitration clauses to be construed broadly and in favor of arbitration. S.A. Mineracao Da Trindade-Samitri v. Utah Int'l, Inc., 745 F.2d 190, 194 (2d Cir. 1984) ("[t]he federal policy favoring arbitration requires us to construe arbitration clauses as broadly as possible."). Moreover, any doubt concerning the scope of issues to be arbitrated is resolved in favor of arbitration. Shaw Group Inc. v. Triplefine Int'l Corp., 322 F.3d 115, 120 (2d Cir. 2003) (finding that the federal policy in favor of arbitration demands that "any doubts concerning the scope of arbitrable issues be resolved in favor of arbitration") (quoting Moses H. Cone Mem'l Hosp., 460 U.S. at 24-25); Collins & Aikman Prod. Co. v. Building Systems, Inc., 58 F.3d 16, 19 (2d Cir. 1995) ("[w]e will compel arbitration 'unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'") (quoting David L. Threlkeld & Co. v. Metallgesellschaft Ltd., 923 F.2d 245, 250 (2d Cir. 1991).

The force of the U.S. policy in favor of arbitration has led the U.S. Supreme Court to find the FAA's provisions to be mandatory: "By its terms, the Act leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." Dean Witter Reynolds Inc. v. Byrd, 470 U.S. 213, 218 (1985) (emphasis in original). When faced with a petition to compel arbitration, therefore, a court's determination is "limited to determining two issues: (i) whether a valid agreement or obligation to arbitrate exists, and (ii) whether one party

to the agreement has failed, neglected or refused to arbitrate." <u>Shaw Group Inc.</u>, 322 F.3d at 120 (quoting <u>PaineWebber Inc.</u> v. <u>Bybyk</u>, 81 F.3d 1193, 1198 (2d Cir. 1996)). Both of these factors are satisfied here.

      B.      <u>The Arbitration Clause Is A Valid Agreement To Arbitrate And Is Binding</u>

Section 10.1 of the Third Amended D&S Agreement sets forth the parties' agreement to arbitrate. (Little Decl., Ex. B § 10.1) The arbitration agreement is broad, requiring arbitration "in the event a dispute arises among the Shareholders regarding the application or interpretation of any provision of this Agreement or the performance thereof, or the availability of any remedies for breach hereunder." (<u>Id.</u>) The arbitration agreement further provides for arbitration "in New York, New York, U.S.A, pursuant to the Commercial Arbitration Rules of the American Arbitration Association, then in effect." (<u>Id.</u>) Each of the Petitioners and PMR Limited are Shareholders as that term is defined in the contract. (<u>Id.</u> § 2.1) Thus, each is bound to arbitrate all disputes under the contract, including Respondents' claim to payment under § 15.11 and Respondents' challenge to QPI's authority to act as general partner of QPPL under § 2.2 of the Third Amended D&S Agreement and the related Limited Partnership Agreement.

PMR Power expressly acknowledged the Third Amended D&S Agreement and has express third party beneficiary rights under the contract, and thus also is bound by the arbitration agreement. (<u>See generally</u>, Little Decl., Ex. B) It is well-established that a third party to an agreement "can be compelled to arbitrate a dispute where the contract had an arbitration provision, the non-signatory had knowledge of the contract, benefitted from the contract and did not object to the terms of the contract." <u>In re Petitions of Laitasalo</u>, 196 B.R. 913, 924 (S.D.N.Y. 1996) (citing <u>Thomson-CFS, S.A.</u> v. <u>Am. Arbitration Assoc.</u>, 64 F.3d 773, 778 (2d Cir. 1993)); <u>see also  Am. Bureau of Shipping</u> v. <u>Tencara Shipyard S.P.A.</u>, 170 F.3d 349, 353 (2d Cir. 1999)

(holding, "[a] party is estopped from denying its obligation to arbitrate when it receives a 'direct benefit' from a contract containing an arbitration clause."); <u>Life Technologies Corp.</u> v. <u>AB Sciex Pte. Ltd.</u>, 803 F. Supp. 2d 270, 276 (S.D.N.Y. 2011) (compelling third party to arbitration where third party "exploited a direct benefit of a[n] . . . agreement containing an arbitration clause"); <u>Wu</u> v. <u>Pearson Educ., Inc.</u>, No. 09-Civ-6557(RJH), 2010 WL 3791676, at *3 (S.D.N.Y Sept. 29, 2010) (binding third party to an arbitration clause in a license agreement third party was not a party to because third party received a "direct benefit from the contract" upon receipt of a portion of the licensing fee under the agreement). PMR Power has received and continues to receive direct benefits under the Third Amended D&S Agreement, including the $8 million closing payment PMR Power received on the closing of the Quezon Power Project and a continuing 2% equity interest in QPPL. (Little Decl., Ex. B §§ 3.2, 4.6(a))  Importantly, PMR Power's current dispute with Petitioners concerning the San Buenaventura Project involves PMR Power's assertion (incorrect as it is) of a direct benefit under the contract – a right to compensation under § 15.11 of the Third Amended D&S Agreement. PMR Power is clearly bound to arbitrate its dispute with Petitioners. <u>Am. Bureau of Shipping</u>, 170 F.3d at 353. The Court should compel Respondents to honor their obligation to arbitrate disputes relating to the Third Amended D&S Agreement.

C.    The Dispute Is Squarely Within The Arbitration Agreement

The Arbitration Agreement provides that <u>any</u> dispute concerning the "application or interpretation of <u>any</u> provision of the Agreement or the performance thereof, or the availability of any remedies for breach [of the Agreement]" must be resolved through arbitration. (Little

18

Decl., Ex. B § 10.1 (emphasis added))  The agreement covers Respondents' dispute with Petitioners concerning the San Buenaventura Project.  Respondents assert two linked claims in connection with the Petitioners' support of the San Buenaventura Project.  <u>First</u>, Respondents claim entitlement to payment under § 15.11 of the Third Amended D&S Agreement.  <u>Second</u>, related to that claim and as a means to gain leverage over Petitioners, Respondents challenge QPI's authority to allow QPPL to enter into the SFS Agreement and permit the use of its property by the San Buenaventura Project under the Limited Partnership Agreement.

In support of their claim to a right to payment under § 15.11, Respondents rely on the parenthetical in § 15.11 which provides, "…PMR Power shall be entitled to certain compensation in respect of the development and financing of any additional coal fired power plant to be located at the site of the [Quezon Power] Project even in the event the officers and shareholders of PMR Power do not actively participate in the development thereof."  (Little Decl., Ex. B § 15.11)  Petitioners disagree with Respondents' interpretation and application of § 15.11 to the San Buenaventura Project on a number of grounds, including that (i) the foregoing parenthetical cannot be read in isolation, (ii) none of the parties to §15.11, OPDCI, QGC and PMR Power, are "participating in the ownership and development" of the San Buenaventura Project which is being developed by third parties, (iii) even if § 15.11 applies, that provision requires only that the parties negotiate in good faith regarding any compensation owed, and (iv) even if § 15.11 applies, that provision is too indefinite to be enforceable under New York law which governs the parties' agreement.  The parties' dispute involves the interpretation and application of § 15.11 and is subject to arbitration in New York under § 10.1.

Regarding Respondents' claim challenging QPI's powers as general partner of QPPL, Respondents contend that (i) the use by the San Buenaventura Project of QPPL's property and

facilities is not among the purposes identified in the Limited Partnership Agreement for which QPPL was formed and (ii) because this use of QPPL's property is inconsistent with the purposes of QPPL, Respondent PMR Limited's prior written consent to the use was required under section 5.1(b) of that agreement. (Little Decl., Ex. D ¶¶ 4.5-4.7) The use of QPPL property and facilities by the San Buenaventura Project was authorized by QPI in its capacity as general partner of QPPL and, consequently, this dispute involves an interpretation of § 2.2 of the Third Amended D&S Agreement which sets forth the purposes and powers of QPI as general partner of QPPL. Indeed, Respondents' claim cannot be resolved without a determination of the scope of QPI's authority as general partner of QPPL under this provision. This dispute too therefore is subject to arbitration in New York.[5] (Id., Ex. B § 10.1)

II.   The Court Should Enjoin Respondents From Their Current And Future Efforts To Avoid Their Obligation To Arbitrate

    A.   The Court Should Grant An Anti-Suit Injunction To Protect Petitioners' Contractual Right To Arbitrate Disputes Under The Contract

The power of federal courts to enjoin foreign suits by persons subject to their jurisdiction is not disputed. China Trade & Dev. Corp v. M.V. Choong Yong, 837 F.2d 33, 35 (2d Cir. 1987) (citation omitted). Likewise, the federal courts' authority to enjoin foreign proceedings in favor of arbitration is well-established. Amaprop Ltd. v. Indiabulls Finan. Servs. Ltd., No. 10 Civ. 1853(PGG), 2010 WL 1050988, * 4 (S.D.N.Y. Mar. 23, 2010) (citations omitted). An anti-suit injunction may be imposed if: (i) the parties are the same in both matters, and (ii) resolution of the case before the enjoining court is dispositive of the action to be enjoined. Paramedics Electromedicina Comercial, Ltd. v. GE Med. Sys. Info. Techs., Inc., 369 F.3d 645, 652 (2d Cir. 2004) (citing China Trade, 837 F.2d at 35). Once these threshold requirements are satisfied,

---

[5] The Limited Partnership Agreement is silent regarding dispute resolution. (See generally, Little Decl., Ex. C)

courts also consider a number of additional factors to determine whether an anti-suit injunction is warranted, including (i) frustration of a policy in the enjoining forum; (ii) the vexatiousness of the foreign action; (iii) a threat to the issuing court's jurisdiction; (iv) whether the proceedings in the other forum prejudice other equitable considerations; or (v) whether adjudication of the same issues in separate actions would result in delay, inconvenience, expense, inconsistency or a race to a judgment. China Trade, 837 F.2d at 35; Storm LLC v. Telenor Mobile Comms. AS, No. 06 Civ. 13157(GEL), 2006 WL 3735657, at * 22-23 (S.D.N.Y. Dec. 15, 2006).

      B.     The Threshold Requirements For An Anti-Suit Injunction Are Satisfied

           1.     The Parties Are The Same

To obtain an anti-suit injunction in aid of arbitration, the parties to the dispute to be enjoined and the parties to the dispute to be resolved by arbitration must be the same. Paramedics, 369 F.3d at 652 (citing China Trade, 837 F.2d at 35). Courts in the Second Circuit have interpreted this threshold factor to require sufficient similarity of the parties. Paramedics, 369 F.3d at 652 (first threshold factor for anti-suit injunction was met where parties to both proceedings were "sufficiently similar"); Storm, 2006 WL 3735657 at *6 (parties to foreign proceeding and to arbitration proceedings, although not identical, were sufficiently similar such that first threshold factor for anti-suit injunction was met). The parties to the two proceedings need not be identical so long as the real parties in interest in both proceedings are the same. Int'l Equity Invs., Inc. v. Opportunity Equity Partners Ltd., 441 F. Supp. 2d 552, 562 (S.D.N.Y. 2006) ("Where parties to the two actions are affiliated or substantially similar, such that their interests are represented by one another, courts have found the first requirement is met."); Motorola Credit Corp. v. Uzan, No. 02 Civ. 666(JSR), 2003 WL 56998, at *2 (S.D.N.Y. Jan. 7, 2003)

(finding sufficient similarity between parties, even though not all parties to the two actions were identical, because "the real parties in interest are the same in both matters").

Here, the real parties in interest to the claims asserted in Respondent PMR Limited's intervention in the ERC proceeding in the Philippines are the same parties named in the New York arbitration, and thus the first threshold requirement is met. The regulatory proceeding for approval of the Power Supply Agreement relating to the San Buenaventura Project was filed by Meralco. PMR Limited filed an Intervention Petition in that proceeding, asserting that (i) the use by the San Buenaventura Project of QPPL's property and facilities is not among the purposes identified in the Limited Partnership Agreement for which QPPL was formed and (ii) because this use of QPPL's property is inconsistent with the purposes of QPPL, Respondent PMR Limited's prior written consent to the use was required under section 5.1(b) of that agreement. (Little Decl., Ex. D ¶¶ 4.5-4.7). Additionally, Respondent PMR Limited contends that the proximity of the San Buenaventura Project to the Quezon Power Plant Facility and the use by the San Buenaventura Project of the property and facilities of the Quezon Power Plant Facility will be detrimental to QPPL.

The use of QPPL's property and facilities by the San Buenaventura Project was authorized by QPI as general partner of QPPL acting pursuant to its authority as general partner of QPPL under § 2.2 of the Third Amended D&S Agreement. The claims asserted by Respondent PMR Limited in the ERC proceeding therefore cannot be resolved without a determination as to QPI's purposes as general partner of QPPL and the scope of QPI's authority as general partner of QPPL under § 2.2. (Id.; see also Id., Ex. B § 2.2) Petitioners QGC and OPDCI are 98% owners of QPI (and Petitioners QGC, OPDCI and GPI own 98% of the voting interest in QPI), and thus are the real parties in interest in any dispute involving the scope of

QPI's powers, which powers were agreed to by Petitioners OPDCI, QGC and GPI and Respondent PMR Limited and set forth in § 2.2. Int'l Equity Invs., Inc., 441 F. Supp. 2d at 562 (finding sufficient similarity where the parties to the two proceedings were affiliated such that their interests were represented by one another); Motorola Credit Corp., 2003 WL 56998, at *2 (sufficient similarity between parties was met where "the real parties in interest are the same in both matters").

The questions raised by PMR Limited in the ERC proceeding will be resolved by the Arbitration. Petitioners' demand for arbitration seeks a determination that QPI, in authorizing QPPL to enter into the SFS Agreement and allowing the use by the San Buenaventura Project of certain unused and underutilized property of QPPL at all times was acting within the scope of its authority as general partner under § 2.2 of the Third Amended D&S Agreement. PMR Limited should not be permitted to sidestep its obligation to arbitrate what is plainly a dispute about the interpretation of the parties' contract by virtue of its improper assertion of that dispute in a proceeding nominally involving different entities. See Storm, 2006 WL 3735657 at *6. This is particularly true, where, as here, any resolution of this dispute by the ERC (who does not have jurisdiction to resolve this issue) threatens to undermine the arbitration proceedings in New York through the risk of an inconsistent ruling. Id. at *6 (finding sufficient similarity of parties where foreign proceeding, while nominally between different entities, involved essentially the same real parties in interest in the New York arbitration and the foreign proceeding sought to influence the arbitration)

The district court's decision in Storm is instructive. In that case, Telenor Mobile Communications ("Telenor") and Storm LLC ("Storm") were nominal parties to a Shareholders Agreement containing an arbitration clause. Id. at *2. The Shareholders Agreement related to

the corporate governance and management of Kyivstar, a company jointly owned by Telenor and Storm. Id. at *1. A dispute arose between Telenor and Storm under the Shareholders Agreement concerning the management of Kyivstar, and Telenor sought redress through the parties' arbitration agreement. Id. at *2. Subsequent to Telenor's initiation of arbitration in New York, legal proceedings were instituted in the Ukraine by Alpren, the 49% owner of Storm. Id. Telenor was not named as a defendant in the Ukrainian action. Id. Following an unfavorable ruling in the Ukrainian proceeding, Telenor moved to compel arbitration and for an anti-suit injunction against Storm, Alpren and Altimo (the ultimate parent of both Storm and Alpren). Id. at *4. Storm objected to Telenor's request for an anti-suit injunction on grounds that Telenor could not meet the first threshold requirement for injunctive relief because the Ukrainian litigation "on its face is not a suit involving the same parties (Telenor and Storm) who are before the arbitrators here, but a suit between a third party, Alpren and Storm." Id. at *5. The district court rejected Storm's "formalistic" and "deceptive" view of the Ukrainian litigation and granted Telenor's request for an anti-suit injunction, finding that "the litigation in Ukraine, while nominally between Alpren and Storm, seeks to influence the arbitration proceedings and has resulted in orders that are directed at Telenor." Id. at *5-6.

Respondent PMR Limited's intervention in the ERC proceedings in the Philippines is analogous to the Ukrainian litigation enjoined by the district court in Storm, and thus the same analysis should apply here. With its Intervention Petition, PMR Limited, in essence, seeks a ruling from the ERC regarding the scope of QPI's business purpose and QPI's authority under § 2.2 of the Third Amended D&S Agreement as general partner of QPPL to permit QPPL to enter into the SFS Agreement and to permit the use of QPPL's property and facilities by the San Buenaventura Project. Any such ruling by the ERC on this question will result in orders that are

24

directed at Petitioners QGC, OPDCI and GPI as owners of QPI and thus threatens to undermine the Arbitration.

        2.     <u>The New York Arbitration Will Be Dispositive Of The Actions To Be Enjoined</u>

The New York Arbitration will be dispositive of (i) the issues Respondents are currently litigating in the Philippines and (ii) the issues to be litigated in the legal and regulatory actions threatened by Respondents, and thus the second threshold requirement also is met.  <u>See</u> <u>Ibeto</u> <u>Petrochemical Indus. Ltd.</u> v. <u>M/T Beffen</u>, 475 F.3d 56, 64-65 (affirming finding that second threshold requirement was met where resolution of the case through arbitration will be dispositive of the foreign proceeding); <u>Storm</u>, 2006 WL 375657, at *7 (second threshold requirement met where the arbitration would be dispositive of the parties' dispute).  Respondents have agreed to binding arbitration in New York as to <u>any</u> disputes regarding the application or interpretation of <u>any</u> provision of the Agreement, the performance of the Agreement and the availability of any remedies for breach of the Agreement.  (Little Decl., Ex. B § 10.1)

As previously noted, Respondent PMR Limited's intervention in the ERC proceedings challenges QPI's authority as general partner of QPPL to permit the use of QPPL's property and facilities by the San Buenaventura Project.  (Little Decl., Ex. D ¶¶ 4.5-4.7)  Specifically, Respondents contend that under the Limited Partnership Agreement (i) the use by the San Buenaventura Project of QPPL's property and facilities is not among the purposes for which QPPL was formed and (ii) because this use of QPPL's property is inconsistent with the purposes of QPPL, Respondent PMR Limited's prior written consent to the use was required under section 5.1(b).  (<u>Id.</u> ¶¶ 4.5-4.7)  The purposes of QPPL, include "to engage in all aspects of (i) financing, obtaining permits for, constructing, owning, and operating the Project; and (ii) obtaining, entering into and performing any and all contracts and engaging in any and all transactions

consistent with the foregoing purpose (the "Purpose")." (Id. ¶ 4.5) Respondents have taken the position in the ERC proceedings that the use by the San Buenaventura Project of the property and facilities of the Quezon Power Plant Facility and the proximity of the San Buenaventura Project to the Quezon Power Plant will be detrimental to QPPL and thus are not consistent with the purpose of QPPL.

The use of QPPL property and facilities by the San Buenaventura Project was authorized by QPI in its capacity as general partner of QPPL under § 2.2 of the Third Amended D&S Agreement. Moreover, the SFS Agreement, which sets forth the arrangement between QPPL and the San Buenaventura Project, was approved by QPI's board of directors. Respondents omit from the Intervention Petition any mention of this or of the applicability of § 2.2 to this dispute. The purposes of QPI and QPI's authority to act as general partner of QPPL are governed by § 2.2. (Petition, Ex. B, § 2.2) Under § 2.2 of the Third Amended D&S Agreement, QPI's purpose is "to act as a general partner in the Project Partnership [QPPL]." (Little Decl., Ex. B § 2.2) Further, under § 2.2 QPI is authorized "to obtain, enter into and perform any and all contracts and engage in any and all transactions consistent with the foregoing purpose." (Id.) Any determination of whether QPI acted inconsistently with this defined purpose and outside the scope of its authority as general partner of QPPL in connection with the San Buenaventura Project necessarily requires an interpretation of § 2.2. Respondents agreed to arbitrate these questions in New York. (Id. § 10.1) Petitioners' arbitration demand seeks a determination under § 2.2 of the Third Amended D&S Agreement that QPI at all times acted within the scope of its authority as general partner of QPPL in connection with the San Buenaventura Project and will resolve the claims made by Respondent PMR Limited in the ERC proceedings.

That the ERC is a foreign regulatory commission does not deprive this Court of the authority to enjoin Respondents from continuing their intervention in that proceeding. Courts in New York have enjoined parties from participating in administrative proceedings under similar circumstances. See, e.g., Software AG, Inc. v. Consist Software Solutions, Inc., No. 08 Civ. 389(CM)(FM), 2008 WL 563449, at *23 (S.D.N.Y. Feb. 21, 2008) (granting injunction "addressed both to the existing lawsuits in Brazil and any pending administrative proceedings, as well as an injunction against the commencement of any further suits"); S.M. Wolff Co. v. Tulkoff, 174 N.E.2d 478, 9 N.Y.2d 356, 361 (N.Y. 1961) (dismissing respondent's claim that New York courts do not have jurisdiction to stay administrative proceedings before out of state agencies and holding "the courts of this State possess the power to stay proceedings [in favor of arbitration] wherever they may be pending"); Curtis, Mallet-Prevost, Colt & Mosle v. Garza-Morales, 308 A.D.2d 261, 270, 762 N.Y.S.2d 607 (N.Y. App. Div. 2003) (finding New York's long-settled law and policy favoring arbitration outweighed foreign jurisdiction's interest and affirming order enjoining respondent from further prosecution of Mexican labor tribunal proceeding); Rothschild v. Naamlooze Vennootschap Gebroeders Pappenheim's Tabakshandel, 87 N.Y.S.2d 189, 190 (N.Y. Sup. Ct. 1949) (issuing an injunction "restraining defendant from prosecuting . . . a proceeding before a Dutch governmental agency for a determination that plaintiff is not a stockholder or creditor").

Similarly, the additional proceedings that Respondents have threatened to bring in the Philippines and elsewhere also necessarily will involve a determination of the Petitioners' and Respondents' rights and remedies under the Third Amended D&S agreement. Regardless of how they dress it up, Respondents' dispute with Petitioners concerns money – payments that Respondents claim they are entitled to under § 15.11 of the Third Amended D&S Agreement as

a result of QPI's support of the San Buenaventura Project. Petitioners and Respondents simply do not agree on how § 15.11 should be interpreted and applied. The dispute must be resolved through arbitration as the parties agreed. Petitioners' Arbitration seeks to do just that. Accordingly, an anti-suit injunction is warranted.

### C.   The Additional Factors Strongly Favor Injunctive Relief

The additional factors relevant to a court's determination of whether to grant an anti-suit injunction strongly favor the granting of injunctive relief.

### 1.   Frustration Of A Policy In The Enjoining Forum

The U.S. has a strong public policy in favor of arbitration. See, e.g., Mitsubishi Motors Corp v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 638-40 (1985); Arciniaga v. General Motors Corp., 460 F.3d 231, 234 (2d Cir. 2006) ("[I]t is difficult to overstate the strong federal policy in favor of arbitration, and it is a policy we have often and emphatically applied." (citations omitted)). This policy "applies with particular force in international disputes." Paramedics, 369 F.3d at 654; see also Telenor Mobile Comms. AS v. Storm LLC, 584 F.3d 396, 410–11 (2d Cir. 2009) ("Litigation undertaken in a foreign forum by a party to [an] arbitration in an attempt to protect itself from an adverse arbitral award would, if indulged, tend seriously to undermine the underlying scheme of the FAA"). Indeed, attempts to interfere with arbitration of international disputes are so strongly disfavored that the Second Circuit has suggested that "an attempt to sidestep arbitration" alone might be "sufficient to support a foreign anti-suit injunction." Paramedics, 369 F.3d at 654; see also Storm, 2006 WL 3735657, at *9.

As noted above, Respondent PMR Powers' Intervention Petition asks the ERC to rule on the interpretation and application of § 2.2 of the Third Amended D&S Agreement, and thus is squarely within the parties' bargained-for arbitration clause. Allowing Respondents to continue

28

their intervention in the ERC proceeding threatens to disrupt the arbitration process in New York and would have the effect of frustrating U.S. policy. See Storm, 2006 WL 3735657, at *8 (enjoining foreign proceedings where "litigation has been designed to, and has the effect of, interfering in the arbitration process"); see also Paramedics, 369 F.3d at 654 (foreign action filed 31 days after arbitration "was a tactic to evade arbitration"). Respondents' threatened future legal and regulatory proceedings likewise threaten to disrupt the New York arbitration and would similarly frustrate U.S. policy in favor of arbitration.

### 2.    Vexatiousness

Respondents' strategy to avoid their obligation to arbitrate in New York and force Petitioners to defend against proceedings in multiple forums is vexatious. Travelport Global Distrib. Sys. v. Bellview Airlines Ltd., No. 12 Civ. 3483(DLC), 2012 WL 3925856, at *7 (S.D.N.Y. Sept. 10, 2012) (finding that "the Nigeria Action is vexatious" when it was initiated "[d]espite Bellview's agreement to resolve this dispute in an arbitral forum"). Respondents could have initiated arbitration in New York, but chose not to do so. Instead, Respondents have acted in bad faith, filing spurious proceedings in the Philippines and making unwarranted and extortionist threats against Petitioners and their affiliates. Such bad faith conduct plainly is vexatious. See, e.g., Amaprop, 2010 WL 1050988, at *6 (finding foreign proceedings vexatious where respondents acted in bad faith and to avoid their obligation to arbitrate); Consist, 2008 WL 563449, at *24-25 (finding that defendant was acting in bad faith by filing applications for relief in Brazil to avoid its obligations in New York). This factor weighs in favor of granting an anti-suit injunction.

### 3.   Threat To This Court's Jurisdiction

Allowing Respondents' to proceed further with their current and threatened legal and regulatory actions in the Philippines threatens any order this Court may enter compelling arbitration of the parties' disputes. This factor plainly favors Petitioners. <u>T-JAT Sys. 2006 Ltd.</u> v. <u>AMDOCS Software Sys. Ltd.</u>, No. 13 Civ. 5356(HB), 2013 WL 6409476, *3 (S.D.N.Y. Dec. 9 2013) (granting an anti-suit injunction where the foreign action "undermines this Court's jurisdiction to compel that arbitration"); <u>see also</u> <u>Paramedics</u>, 369 F.3d at 654 ("An anti-suit injunction may be needed to protect the court's jurisdiction once a judgment has been rendered").

### 4. Delay, Inconvenience, Expense And Risk Of Inconsistent Judgments

Petitioners should not be subject to the expense and inconsistency of the Respondents' intervention in the ERC regulatory proceeding in the Philippines where that intervention seeks, in essence, a ruling under § 2.2 of the Third Amended D&S Agreement on whether QPI acted inconsistently with its purpose and outside its authority in permitting QPPL to enter into the SFS Agreement and to allow the use of QPPL property and facilities by the San Buenaventura Project, where Respondents contend that QPPL's participation in the San Buenaventura Project will be detrimental to QPPL. To make such a ruling, the ERC necessarily will be required to interpret § 2.2 of the Third Amended D&S Agreement. Any dispute regarding the interpretation of a provision of the Third Amended D&S Agreement, including QPI's purpose or authority under § 2.2, is subject to arbitration in New York. (Petition, Ex. B § 10.1) The ERC simply has no jurisdiction to decide this matter. <u>Amaprop</u>, 2010 WL 1050988, at *7; <u>see also</u> <u>Ibeto</u>, 475 F.3d at 64-65 ("adjudication of the same issues in two separate actions would result in inconvenience [and] inconsistency . . . ."); <u>A.P Moeller-Maersk A/S</u> v. <u>Comercializadora de</u>

Calidad S.A., 429 F. App'x 25, 30 (2d Cir. 2011) (duplicative litigation is likely to cause, delay, inconvenience, expense and inconsistency).

      Similarly, Petitioners should not be held hostage by Respondents' threats of future legal and regulatory proceedings with respect to the San Buenaventura Project and the delay, inconvenience, expense and risk of inconsistent judgments associated with such proceedings. Respondents' dispute with Petitioners boils down to two claims (i) the claim that Respondents are entitled to payment under § 15.11 of the Third Amended D&S Agreement in connection with QPPL's support of the San Buenaventura Project and (ii) the claim that QPI acted without authority under § 2.2 of the Third Amended D&S Agreement in permitting QPPL to enter into the SFS Agreement and in permitting the use of QPPL's property and facilities by the San Buenaventura Project.  Any additional legal and regulatory proceedings Respondents bring in the Philippines or otherwise, thus necessarily will involve the interpretation and application of the Third Amended D&S Agreement (§ 15.11 and § 2.2, respectively) and the parties' rights and remedies thereunder.  These questions are squarely within the parties' bargained-for arbitration agreement.

      Respondents' intervention in the regulatory proceeding in the Philippines is plainly an attempt to "race to judgment" and is improper.  Specifically, Respondents' intervention (and its threatened future legal and regulatory actions) is merely an attempt by Respondents to co-opt the arbitration process by resorting to a forum which they view as giving them home-court advantage.  Indeed, Chalmers repeatedly has referenced his "political connections" in the Philippines and his ability, through these connections, to have Petitioners' directors "thrown in jail" and to derail and/or effectively terminate the San Buenaventura Project if Petitioners do not accede to his interpretation of the Third Amended D&S Agreement and pay Respondents off.

Such tactics weigh in favor of granting injunctive relief.  See Storm, 2006 WL 3735657, at *10 (contrasting Telenor's attempt to arbitrate the dispute in a neutral forum with Storm's attempt to coopt the process by resorting to a forum in which they have home-court advantage and finding the factors relevant to an award of anti-suit relief strongly in favor of Telenor); see also Amaprop, 2010 WL 1050988, at *8 (finding Judge Lynch's remarks in Storm concerning the risk of inconsistent judgments and a threat of a race to judgment to apply with equal force and granting anti-suit injunction).

> ### D.   Petitioners Also Are Entitled To Preliminary Injunctive Relief Under Traditional Standards

While Petitioners are entitled to an anti-suit injunction in aid of the Arbitration in New York, they also are entitled to preliminary injunctive relief under traditional standards.  First, Petitioners are likely to succeed on the merits of their arbitration claims against Respondents. Second, Petitioners will suffer irreparable harm if Respondents are not enjoined from further pursuing legal or regulatory proceedings in the Philippines or elsewhere, in violation of their agreement to arbitrate, through the loss of their contractual right to have their disputes with Respondents resolved through arbitration.  Third, the balance of equities strongly weighs in Petitioners' favor where, if Respondents' are not enjoined, the very existence of the San Buenaventura Project will be threatened to the detriment of Petitioners.  Respondents, by contrast, simply won't be allowed to continue their extortion and harassment of Petitioners. Fourth, the strong public policy in favor of arbitration and the endangerment of the San Buenaventura Project which is considered critical to the economy of the Philippines render Petitioners' request for injunctive relief in the public interest.

> ### 1.   Petitioners Will Succeed On The Merits

Petitioners will succeed on the merits of their arbitration claims. In the Arbitration, Petitioners seek a determination that Respondents are not entitled to any payments with respect to QPI's support of the San Buenaventura Project under § 15.11 of the Third Amended D&S Agreement. That provision provides, "Each of OPDCI, OGC and PMR Power agrees that it is the intention of the parties that participation in the ownership and development of any additional coal-fired power plant at the site of the Project shall be on terms and conditions similar to those set forth in the D&S Agreement, adjusted to reflect the extent of the participation of the respective parties and the contributions to be made . . . which adjusted terms and conditions OPDCI, QGC and PMR Power agree to negotiate in good faith." (Little Decl., Ex. B § 15.11) On its face, § 15.11 does not entitle PMR Power to payments with respect to the San Buenaventura Project for at least three reasons.

First, none of OPDCI, QGC or PMR Power are "participating in the ownership and development" of the San Buenaventura Project, and thus § 15.11 does not apply to the Project. The San Buenaventura Project is being developed and is owned by New Growth and MPG. The fact that the relationship between the Quezon Power Plant Facility and the San Buenaventura Project will result in shared maintenance and operating costs and the ownership of new common use facilities to be shared by both plants, simply does not rise to the level of "development and ownership of an[] additional coal-fired power plant."

Second, even if § 15.11 is applicable to the Project – it is not – that provision is merely an agreement to negotiate in good faith. New York law disfavors agreements to negotiate in good faith and enforces them only where the parties have already agreed to the essential terms of the contract (which is not the case here). Atla-Medine v. Crompton Corp., No. 00 Civ. 5901(HB), 2001 WL 1382592, at *5 (S.D.N.Y. 2001) (citing Arcadian Phosphates, Inc. v. Arcadian Corp.,

884 F.2d 69, 72 (2d Cir.1989)) (finding no enforceable agreement where parties had stated they "should negotiate the terms and conditions" and noting that New York law will only enforce a promise to negotiate where the "essential terms" have been agreed to).  In any event, Petitioners have satisfied their obligation to negotiate with Respondents in good faith.  Rossoff v. Mountain Laurel Center for Performing Arts, 317 F. Supp. 2d 493, 498 (S.D.N.Y. 2004) (holding that "[i]f the open terms cannot be resolved despite good faith negotiations, the parties' obligations are at an end.").

Third, § 15.11 is too indefinite to be enforceable under New York law which law governs the parties' agreement.  Section 15.11 provides that "participation in the ownership and development of any additional coal-fired power plant at the site of the Project shall be on terms and conditions similar to those set forth in the D&S Agreement, . . . adjusted to reflect the extent of the participation of the respective parties and the contributions to be made . . . which adjusted terms and conditions OPDCI, QGC and PMR Power agree to negotiate in good faith."  (Little Decl., Ex. B § 15.11)  That provision also provides that "PMR Power shall be entitled to certain compensation" also to be negotiated and subject to adjustment depending on the extent of PMR Power's participation.  (Id. (emphasis added))  Where a material term in a contract is left open to negotiation, and there is no indication of the parties' intent regarding that term, the provision to negotiate is viewed by New York courts as a mere agreement to agree that is too indefinite to be enforced. Ward v. Pricecellular Corp., No. 90 Civ. 5214(MGC)1991 WL 64043, at *6 (S.D.N.Y. 1991).  Section 15.11 is analogous to speculative agreements that New York courts have found to be unenforceable.  See, e.g., Joseph Martin Jr., Delicatessen v. Schumacher, 417 N.E.2d 541, 52 N.Y.2d 105, 110-11 (N.Y. 1981) (provision that lease may be renewed "at annual rentals to be agreed upon" unenforceable); Glanzer v Keilin & Bloom LLC, 281 A.D.2d 371, 371-72 (N.Y.

App. Div. 2001) (investment bank's alleged promise to pay employees an "equity interest in the firm" was too indefinite to permit enforcement); Freedman v. Pearlman, 271 A.D.2d 301, 303 (N.Y. App. Div. 2000) (agreement "to provide 'fair compensation' . . . [was] too indefinite to be enforced").

In the Arbitration, Petitioners also seek a determination that QPI has, at all times, in its support of the San Buenaventura Project, acted in accordance with § 2.2 of the Third Amended D&S Agreement.  In its intervention in the proceedings before the ERC, Respondents contend that QPI acted outside its purpose and its authority as general partner of QPPL in causing QPPL to enter into the SFS Agreement that will allow QPPL to share maintenance and operating costs of some unused and underutilized assets of the Quezon Power Plant Facility and to receive certain new and upgraded facilities that will be built and paid for by the San Buenaventura Project.  (Little Decl., Ex. D)  Specifically, Respondents assert that the proximity of the San Buenaventura Project to the Quezon Power Plant Facility and the use of the Quezon Power Plant's property and assets by the San Buenaventura Project will be detrimental to the Quezon Power Plant Facility.  Because of this, Respondents argue that QPI was required to obtain PMR Limited's consent regarding QPI's support of the San Buenaventura Project.  (Id.)  Respondents are wrong for at least two reasons.

First, QPI's support of the San Buenaventura Project and decision to allow QPPL to enter into the SFS Agreement is squarely within QPI's purpose as defined in the Third Amended D&S Agreement.  Section 2.2 of the agreement defines the purposes of QPI as "(i) to act as a general partner and a limited partner in [QPPL] and...(ii) to enter into and perform any and all contracts and engage in any and all transactions consistent with the foregoing purpose."  (Little Decl., Ex. B § 2.2)  Allowing QPPL to enter into an agreement that will allow QPPL to share maintenance

35

and operating costs of unused and underutilized assets and receive new and upgraded shared use facilities is beneficial to QPPL (and to Respondents) and is consistent with QPI's authority as general partner of QPPL.  It is also squarely within QPI's (and its board of directors) authority to make a determination that the proximity of the San Buenaventura Project to the Quezon Power Plant and the use of QPPL's property and facilities by that project is not detrimental to QPPL, and thus not inconsistent with the purposes of QPPL.

Second, QPI's support of the San Buenaventura Project is within the scope of QPI's authority as general partner of QPPL and is consistent with the purposes of QPI and QPPL, and thus PMR Limited's consent is not required.  The purpose of QPPL is defined in the Limited Partnership Agreement as "to engage in all aspects of (i) financing, obtaining permits for, constructing, owning, and operating the Project; and (ii) obtaining, entering into and performing any and all contracts and engaging in any and all transactions consistent with the foregoing purpose (the 'Purpose')."  (Little Decl., Ex. C, Recital D)  Respondents' contention that QPI's determination, as general partner of QPPL, to enter into an arrangement with the San Buenaventura Project whereby QPPL would gain a partner to share maintenance and operating costs as well as new and upgraded facilities – at no cost to QPPL – was outside the scope of the broad purpose "of all aspects of…owning and operating" the Quezon Power Plant Facility is unreasonable.  Such actions are plainly within the purpose of QPPL as set forth in the parties' agreement.  PMR's consent was not required and Petitioners will succeed on the merits of this claim as well.

2. Petitioners Will Suffer Irreparable Harm

If Respondents are not enjoined from proceeding further with their legal and regulatory actions in the Philippines and elsewhere, Petitioners will suffer irreparable harm through the loss of their contractual right to have their disputes under the Third Amended D&S Agreement arbitrated. Courts have held that the loss of a contractual benefit for which the parties bargained constitutes irreparable harm for the purposes of granting injunctive relief. See, e.g., Gen. Protecht Grp., Inc. v. Levion Mfg. Co., Inc., 651 F.3d 1355, 1363 (Fed. Cir. 2011) (affirming granting of injunction and finding "[Plaintiff] would likely be irreparably harmed in the absence of a preliminary injunction because it would be deprived of its bargained-for forum"); Natsource LLC v. Paribello, 151 F. Supp. 2d 465, 469 (S.D.N.Y. 2001) (granting injunctive relief and holding "Natsource would be irreparably harmed if it did not receive the benefit of its bargain").

### 3. The Balance of Equities Favors Petitioners

There is simply no harm to Respondents if preliminary injunctive relief is granted. Although Respondents seek a resolution, from the ERC, regarding their claim to consent rights with respect to the San Buenaventura Project, the ERC has no jurisdiction to resolve this question, and thus there is no real harm to Respondents if they are enjoined from proceeding with the Intervention Petition. Petitioners, by contrast, face the loss of the benefit of their bargain to have their disputes with Respondents resolved through arbitration and risk unfavorable and inconsistent rulings in the Philippines in forums that do not properly have jurisdiction over the matters to be resolved.

In determining the balance of equities, courts consider "which of the two parties would suffer most grievously if the preliminary injunction motion were wrongly decided." Tradescape.com v. Shivaram, 77 F. Supp. 2d 408, 411 (S.D.N.Y. 1999). Here, Petitioners bear all the risk of a wrong determination, including (i) the loss of their contractual right to arbitrate

all disputes relating to the Third Amended D&S Agreement, (ii) the risk of substantial money judgments against them if Respondents are allowed to continue to sidestep their obligation to arbitrate and file baseless proceedings in the Philippines and (iii) the risk of the loss a beneficial relationship with the San Buenaventura Project.  Respondents simply bear no corresponding risk if they are enjoined.  Equity favors the granting of preliminary injunctive relief.

### 4.    Injunctive Relief Is In The Public Interest

Petitioners' request for a preliminary injunction implicates the public interest in two ways.  First, as previously noted, the U.S. has a strong public policy in favor of arbitration. Arciniaga, 460 F.3d at 234 ("[I]t is difficult to overstate the strong federal policy in favor of arbitration, and it is a policy we have often and emphatically applied.").  This strong public policy favors the granting of injunctive relief here.  Telenor, 584 F.3d at 410–11 ( "[l]itigation undertaken in a foreign forum by a party to [an] arbitration in an attempt to protect itself from an adverse arbitral award would, if indulged, tend seriously to undermine the underlying scheme of the FAA[.]")  Second, the San Buenaventura Project is viewed in the Philippines as critical to the economy and the well-being of the Filipino people, who suffer high electricity prices and chronic capacity shortages.  (Palumbo Decl. ¶ 9) Respondents' current and threatened legal and regulatory actions relating to the San Buenaventura Project threaten to derail (or at a minimum substantially delay) this project.  Specifically, Respondents' Intervention Petition was filed for the sole purpose of obstructing the ERC's approval of the Power Supply Agreement between Meralco and San Buenaventura Power, Ltd.  The financing for the San Buenaventura Project is contingent on ERC approval of the Power Supply Agreement, and thus the failure to obtain that approval threatens the very existence of the project.  Respondents should be enjoined so that this does not occur.

## CONCLUSION

For the foregoing reasons, the Court should enter an order (i) compelling Respondents to arbitrate in New York and (ii) granting an anti-suit injunction, or alternatively, a preliminary injunction (a) directing Respondent PMR Limited to dismiss or cause to be dismissed the Intervention Petition filed in the regulatory proceeding initiated by Meralco in the Philippines in connection with the San Buenaventura Project and (b) restraining the Respondents, and all persons or entities acting on their behalf, from bringing any further legal or regulatory action in the Philippines or any other jurisdiction with respect to the San Buenaventura Project.

Dated: New York, New York
       October 10, 2014

WHITE & CASE LLP

By: _____
       Gregory G. Little (GL 5850)
       David G. Hille (DH 9865)
       Danielle M. Audette (DA 1218)
       1155 Avenue of the Americas
       New York, New York 10036
       Tel:  (212) 819-8200

       *Attorneys for Petitioners*